BAYER HEALTHCARE LLC,

                              Plaintiff,

        v.

JOHNSON & JOHNSON, INC. and JANSSEN
BIOTECH, INC.,

                              Defendants.

Case No. 26-CV-1479 (DEH)

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S
MOTION FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................... iii

PRELIMINARY STATEMENT ................................................................................................. 1

FACTUAL BACKGROUND ...................................................................................................... 3

    A.    The Parties and Products ........................................................................................... 3

    B.    Clinical Trials Versus Real-World Data ................................................................... 4

    C.    The Study at Issue ..................................................................................................... 5

        1.    Methodology ................................................................................................. 5

        2.    Conclusions ................................................................................................... 6

    D.    Communications About the Study .............................................................................. 7

        1.    The IPCU Presentation ................................................................................. 7

        2.    The Overview Slide ...................................................................................... 8

        3.    The Press Release ......................................................................................... 9

    E.    Procedural History ..................................................................................................... 9

LEGAL STANDARD .................................................................................................................. 9

ARGUMENT .............................................................................................................................. 10

I.       THIS COURT IS AN IMPROPER FORUM FOR THIS DISPUTE ............................... 10

    A.    General Jurisdiction ................................................................................................. 11

    B.    Specific Jurisdiction ................................................................................................ 11

    C.    Venue ....................................................................................................................... 13

II.      BAYER HAS NOT SHOWN LIKELY SUCCESS ON THE MERITS .......................... 14

    A.    The Challenged Statements Are Protected By The First Amendment ................... 14

    B.    The Challenged Statements Are Not False .............................................................. 16

        1.    Legal Standards ........................................................................................... 16

        2.    None of the Challenged Materials Are Literally False .............................. 19

        3.    Bayer's Methodological Critiques Lack Merit .......................................... 22

i

      4.      FDA's "Substantial Evidence" Standard Is Inapplicable........................30

    C.     Bayer's Unclean Hands Bar Relief.......................................................31

III.    BAYER HAS FAILED TO ESTABLISH IRREPARABLE HARM .............................31

IV.    NEITHER THE BALANCE OF EQUITIES NOR THE PUBLIC INTEREST FAVORS INJUNCTIVE RELIEF..................................................................................32

CONCLUSION....................................................................................................................34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Abilify (Aripiprazole) Prods. Liab. Litig.*,
    299 F. Supp. 3d 1291 (N.D. Fla. 2018)..................................................................25

*Am. Council of Certified Podiatric Phys. & Surgeons v. Am. Bd. of Podiatric
    Surgery*, 185 F.3d 606 (6th Cir. 1999)..................................................................18

*Amarin Pharma, Inc. v. FDA*,
    119 F. Supp. 3d 196 (S.D.N.Y. 2015)..................................................................31

*Apotex Inc. v. Acorda Therapeutics, Inc.*,
    2014 WL 5462547 (S.D.N.Y. Oct. 23, 2014) ......................................................19

*Apotex Inc. v. Acorda Therapeutics, Inc.*,
    823 F.3d 51 (2d Cir. 2016)............................................................................17, 19

*Aprahamian v. Sandoz, Inc.*,
    2026 WL 221286 (S.D.N.Y. Jan. 28, 2026) ......................................................12

*Barrett v. Uber Techs. Inc.*,
    LLC, 2025 WL 3538599 (S.D.N.Y. Dec. 10, 2025)............................................13

*Biolase, Inc. v. Fotona Proizvodnja Optoelektronskih Naprav D. D.*,
    2014 WL 12579802 (C.D. Cal. June 4, 2014) ....................................................24

*Boule v. Hutton*,
    328 F.3d 84 (2d Cir. 2003)..................................................................................14

*Bracco Diagnostics, Inc. v. Amersham Health, Inc.*,
    627 F. Supp. 2d 384 (D.N.J. 2009) ...............................................................14, 18

*Bristol-Myers Squibb Co. v. Superior Court*,
    582 U.S. 255 (2017)............................................................................................11

*Broadspring, Inc. v. Congoo, LLC*,
    2014 WL 7392905 (S.D.N.Y. Dec. 29, 2014) ....................................................21

*Brown v. Lockheed Martin Corp.*,
    814 F.3d 619 (2d Cir. 2016)................................................................................11

*Buckman Co. v. Plaintiffs' Legal Comm.*,
    531 U.S. 341 (2001)............................................................................................25

*Buetow v. A.L.S. Enters., Inc.*,
 650 F.3d 1178 (8th Cir. 2011) ..................................................................17

*Cassava Sciences, Inc. v. Bredt*,
 2024 WL 1347362 (S.D.N.Y. Mar. 28, 2024) ........................................16

*Castrol, Inc. v. Quaker State Corp.*,
 977 F.2d 57 (2d Cir. 1992).......................................................................19

*Christie v. Hyatt Corp.*,
 2024 WL 2387513 (E.D.N.Y. May 23, 2024) ........................................11

*Christopher Phelps & Assocs., LLC v. Galloway*,
 492 F.3d 532 (4th Cir. 2007) ..................................................................10

*Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH*,
 843 F.3d 48 (2d Cir. 2016).......................................................................17

*CleanSpark, Inc. v. Discover Growth Fund, LLC*,
 485 F. Supp. 3d 494 (S.D.N.Y. 2020).....................................................10

*Conn. Bar Ass'n v. United States*,
 620 F.3d 81 (2d Cir. 2010).......................................................................14

*Core-Vent Corp. v. Nobel Indus. Sweden A.B.*,
 163 F.3d 605 (9th Cir. 1998) .............................................................. *passim*

*Creative Photographers, Inc. v. Grupo Televisa, S.A.B.*,
 763 F. Supp. 3d 618 (S.D.N.Y. 2025).....................................................12

*Daileader v. Certain Underwriters at Lloyds London*,
 96 F.4th 351 (2d Cir. 2024) .....................................................................10

*Daimler AG v. Bauman*,
 571 U.S. 117 (2014)..................................................................................11

*Doe 1 v. Congregation of Sacred Hearts of Jesus & Mary*,
 2023 WL 185496 (S.D.N.Y. Jan. 13, 2023) ..........................................13

*eBay Inc. v. MercExchange, L.L.C.*,
 547 U.S. 388 (2006)..................................................................................32

*Express Gold Cash, Inc. v. Beyond 79, LLC*,
 2019 WL 4394567 (W.D.N.Y. Sept. 13, 2019) ......................................16

*Fresh Del Monte Produce Inc. v. Del Monte Foods Co.*,
   933 F. Supp. 2d 655 (S.D.N.Y. 2013)......................................................................32

*G31000 N. Am., Inc. v. Paris*,
   2014 WL 6604790 (S.D.N.Y. Nov. 21, 2014)............................................................12

*Gillette Co. v. Norelco Consumer Prods. Co.*,
   946 F. Supp. 115 (D. Mass. 1996) ............................................................................23

*In re GNC Corp.*,
   789 F.3d 505 (4th Cir. 2015) ....................................................................................17

*Grand River Enter. Six Nations, Ltd. v. Pryor*,
   481 F.3d 60 (2d Cir. 2007)........................................................................................31

*Gulf Ins. Co. v. Glasbrenner*,
   417 F.3d 353 (2d Cir. 2005)......................................................................................13

*Hartford Fire Ins. Co. v. Maersk Line*,
   2019 WL 4450639 (S.D.N.Y. Sept. 17, 2019)..........................................................11

*Homeschool Buyers Club, Inc. v. Brave Writer, LLC*,
   2020 WL 1166053 (S.D.N.Y. Mar. 11, 2020) ..........................................................10

*Int'l Dairy Foods Ass'n v. Amestoy*,
   92 F.3d 67 (2d Cir. 1996)..........................................................................................33

*J&J Vision Care, Inc. v. 1-800 Contacts, Inc.*,
   299 F.3d 1242 (11th Cir. 2002) ................................................................................19

*J&J Vision Care, Inc. v. Ciba Vision Corp.*,
   348 F. Supp. 2d 165 (S.D.N.Y. 2004).......................................................................17

*Kurin, Inc. v. ICU Med., Inc.*,
   2024 WL 5416672 (C.D. Cal. Nov. 8, 2024).............................................................23

*Kurin, Inc. v. Magnolia Med. Techs., Inc.*,
   473 F. Supp. 3d 1117 (S.D. Cal. 2020).....................................................................20

*Mazurek v. Armstrong*,
   520 U.S. 968 (1997)....................................................................................................9

*McNeil-P.C.C., Inc. v. Bristol-Myers Squibb Co.*,
   938 F.2d 1544 (2d Cir. 1991).........................................................................2, 19, 22

*Megna v. Biocomp Labs., Inc.*,
  166 F. Supp. 3d 493 (S.D.N.Y. 2016)......................................................12

*Mergenthaler v. Zimbler*,
  2025 WL 1358518 (E.D.N.Y. Jan. 30, 2025) ........................................13

*Metro. Opera Ass'n, Inc. v. Local 100, Hotel Emps. & Rest. Emps. Intern. Union*,
  239 F.3d 172 (2d Cir. 2001)....................................................................33

*Moog Inc. v. Skyryse, Inc.*,
  2022 WL 17720965 (W.D.N.Y. Dec. 15, 2022)......................................10

*MSP Recovery Claims, Series LLC v. Takeda Pharms. Am., Inc.*,
  2020 WL 13804744 (S.D.N.Y. 2020)......................................................18

*Munchkin, Inc. v. Playtex Prods., LLC*,
  2011 WL 2174383 (C.D. Cal. Apr. 11, 2011) ........................................23

*Nationwide Tarps, Inc. v. Midwest Canvas Corp.*,
  244 F. Supp. 2d 14 (N.D.N.Y. 2003).......................................................20

*NewMarkets Partners LLC v. Sal. Oppenheim Jr. & CIE*,
  638 F. Supp. 2d 394 (S.D.N.Y. 2009)......................................................12

*Nichino Am., Inc. v. Valent U.S.A. LLC*,
  44 F.4th 180 (3d Cir. 2022) ....................................................................32

*ONY, Inc. v. Cornerstone Therapeutics, Inc.*,
  720 F.3d 490 (2d Cir. 2013).............................................................. *passim*

*Pacira BioSciences, Inc. v. Am. Soc'y of Anesthesiologists, Inc.*,
  63 F.4th 240 (3d Cir. 2023)....................................................................16

*Penguin Grp. (USA) Inc. v. Am. Buddha*,
  609 F.3d 30 (2d Cir. 2010)......................................................................10

*Pfizer Inc. v. Miles, Inc.*,
  868 F. Supp. 437 (D. Conn. 1994)..........................................................20

*In re Philip Morris Int'l Inc. Sec. Litig.*,
  437 F. Supp. 3d 329 (S.D.N.Y. 2020).....................................................22

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*,
  413 U.S. 376 (1973)................................................................................33

*Princeton Graphic Operating, L.P. v. NEC Home Elecs.*,
    732 F. Supp. 1258 (S.D.N.Y. 1990)................................................................17

*Procter & Gamble Co. v. Chesebrough-Pond's, Inc.*,
    747 F.2d 114 (2d Cir. 1984)..................................................................19, 23

*Real Selling Grp. LLC v. ESN Grp., Inc.*,
    2021 WL 535748 (S.D.N.Y. Feb. 12, 2021).....................................................12

*Rhone-Poulenc Rorer Pharms., Inc. v. Marion Merrell Dow, Inc.*,
    93 F.3d 511 (8th Cir. 1996) ...........................................................18, 22, 23

*In re Riddell Concussion Reduction Litig.*,
    121 F. Supp. 3d 402 (D.N.J. 2015)................................................20, 22, 23

*Riddell, Inc. v. Schutt Sports, Inc.*,
    724 F. Supp. 2d 963 (W.D. Wis. 2010) ...........................................................24

*Sandoz Pharms. Corp. v. Richardson-Vicks, Inc.*,
    902 F.2d 222 (3d Cir. 1990)...............................................................18

*Schering-Plough Healthcare Prods. v. Schwartz Pharma, Inc.*,
    586 F.3d 500 (7th Cir. 2009) .............................................................17

*Sherman v. Abengoa, S.A.*,
    156 F.4th 152 (2d Cir. 2025) ............................................................22

*Smith v. PacerMonitor, LLC*,
    2020 WL 702224 (S.D.N.Y. Feb. 12, 2020)....................................................13

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011)....................................................................15

*St. Joseph's Hosp. Health Ctr. v. Am. Anesthesiology of Syracuse*,
    131 F.4th 102 (2d Cir. 2025).............................................................32

*Stokely-Van Camp, Inc. v. Coca-Cola Co.*,
    646 F. Supp. 2d 510 (S.D.N.Y. 2009)....................................................31

*Time Warner Cable, Inc. v. DIRECTV, Inc.*,
    497 F.3d 144 (2d Cir. 2007)..............................................................17

*United States v. Caronia*,
    703 F.3d 149 (2d Cir. 2012)..............................................................31

*Washington v. Networks Presentations*,
2025 WL 968741 (S.D.N.Y. Mar. 31, 2025) .......................................................11

*Winter v. NRDC, Inc.*,
555 U.S. 7 (2008)...............................................................................................32

*Wohlbach v. Ziady*,
2018 WL 3611928 (S.D.N.Y. July 25, 2018) ....................................................14

*Zesty Paws LLC v. Nutramax Lab'ys, Inc.*,
157 F.4th 194 (2d Cir. 2025) .............................................................................17

*Ziboukh v. Whaleco, Inc.*,
795 F. Supp. 3d 349 (E.D.N.Y. 2025) ...............................................................12

**Statutes**

15 U.S.C. § 1117(a) .................................................................................................31

15 U.S.C. § 1125(a) .................................................................................................14

21 U.S.C. § 355(d)...................................................................................................30

28 U.S.C. § 1391(b)...........................................................................................13, 14

**Other Authorities**

21 C.F.R. § 314.126 .................................................................................................30

C.P.L.R. § 301....................................................................................................10, 11

C.P.L.R. § 302..............................................................................................10, 11, 12

Defendants Janssen Biotech, Inc. ("JBI") and Johnson & Johnson ("J&J") submit this opposition to Plaintiff Bayer HealthCare LLC's ("Bayer") Motion for Preliminary Injunction.

## PRELIMINARY STATEMENT

Bayer asks this Court to declare JBI's statements about its peer-reviewed scientific research "literally false," and to bar JBI from sharing its results with healthcare practitioners. Bayer's request abuses the Lanham Act and violates the First Amendment. It should be denied.

JBI and Bayer market prostate cancer medications. JBI's is called ERLEADA®, and Bayer's, NUBEQA®. Their pivotal clinical trials reached strikingly different results. ERLEADA showed a significant improvement in overall survival when used in the relevant manner. NUBEQA, by contrast, *failed* to show any statistically significant improvement in overall survival.

Intrigued by this disparity, JBI sponsored a retrospective study (an analysis of preexisting medical records) to see how survival rates compared in a real-world population of patients treated with these medications. The study found that the ERLEADA patients had a 51% reduction in risk of death compared to the NUBEQA patients over the relevant study period. JBI submitted its methods and results for peer review and was invited to present them at a medical congress in early February. J&J also issued a press release and posted a few slides online truthfully describing the research. Bayer responded by filing this "emergency" lawsuit and seeking a gag order.

At the threshold, this Court lacks personal jurisdiction over Defendants, and venue is improper in this District. Every party is headquartered and incorporated in the Third Circuit, and the Complaint lacks any New York-specific allegations. Bayer challenges just three communications on websites accessible worldwide—not promotional activity occurring in or targeting New York. This case is here solely because of Bayer's forum shopping.

That aside, the relief Bayer seeks is anathema to the public interest in free scientific discourse. Courts "have been careful not to permit overextension of the Lanham Act to intrude on

1

First Amendment values." *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 496-98 (2d Cir. 2013). Open scientific debate is a critical First Amendment precept. Thus, as the Second Circuit has instructed, "to the extent a speaker...draws [scientific] conclusions from non-fraudulent data, based on accurate descriptions of the data and methodology underlying those conclusions,...those statements are not grounds for a claim of false advertising." *Id.*

Beyond its affront to free speech, Bayer's Lanham Act claim fails on the merits. It is based *solely* on a theory of "literal falsity," not "deception" (because the latter requires evidence that listeners were deceived, and Bayer has none). The literal-falsity test is "rigorous," and Bayer cannot meet it. Contrary to Bayer's telling, JBI has never made an unqualified claim that ERLEADA is *proven* to reduce "Death Risk" by 51% more than NUBEQA. JBI has accurately described the results of a single data analysis, disclosing its methodology and limitations. That cannot be "literally false," especially given the audience of experienced physicians.

Even if JBI had made an unqualified "test-proven" claim, Bayer *still* could not show falsity. To do that, "a plaintiff must do more than show that the tests supporting the challenged claim are unpersuasive." *McNeil-P.C.C., Inc. v. Bristol-Myers Squibb Co.*, 938 F.2d 1544, 1549 (2d Cir. 1991). It must show that the tests are so "conclusive[ly]" flawed as to be "worthless" or "irrelevant." Bayer's critiques do not approach that showing. Again, independent peer reviewers approved the very methods and conclusions Bayer challenges and invited JBI to present its findings. Moreover, many of Bayer's critiques apply equally to Bayer's own research.

Bayer also has no evidence that it has suffered harm, let alone *irreparable* harm. The prescribers of these cancer medications are medical specialists who critically evaluate publications like these, rather than taking them at face value. Their identities are known to both JBI and Bayer,

who track their prescribing practices using up-to-the-minute data. Yet Bayer offers no evidence of any lost prescriptions, diminished sales, or other injury.

Nor do the equities favor Bayer. Rather, Bayer comes to this Court with unclean hands. Bayer has committed the same methodological "sins" it complains of here, and has falsely advertised NUBEQA vis-à-vis ERLEADA. JBI anticipates bringing counterclaims regarding that advertising. In the meantime, this renders Bayer ineligible for "extraordinary" equitable relief.

Finally, the public interest does not favor an injunction. Patients have a vital interest in the free flow of scientific information regarding treatment of life-threatening diseases. If JBI is enjoined from discussing its research, physicians will be deprived of real-world data that can help them make critical therapeutic choices. By contrast, if JBI is *not* enjoined, Bayer can continue sharing its views of JBI's study with the medical community (as it is already doing), so that these sophisticated physicians can make their own informed decisions.

## FACTUAL BACKGROUND

### A. The Parties and Products

J&J is a pharmaceutical and medical technology corporation headquartered and incorporated in New Jersey. Compl. ¶18. JBI is a J&J subsidiary that specializes in oncology and immunology. It is headquartered and incorporated in Pennsylvania. *Id.* ¶19. Bayer is a limited liability company based in New Jersey and organized under Delaware law. *Id.* ¶17.

The parties market competing prostate cancer medications: JBI's ERLEADA (apalutamide) and Bayer's NUBEQA (darolutamide). Courtney Morrow Declaration ("Morrow") ¶14. As relevant here, both are FDA-approved to treat metastatic castration-sensitive prostate cancer ("mCSPC"). *Id.* Medications in this class are used either in "triplet therapy" or "doublet therapy." *Id.* ¶10; Charles G. Drake Declaration ("Drake") ¶17. Triplet therapy means the medication is used alongside both androgen deprivation therapy and docetaxel, a chemotherapy

agent. Morrow ¶10. Doublet therapy means the medication is used with androgen deprivation therapy, but *not* docetaxel. *Id.* ERLEADA has been FDA-approved for doublet therapy in mCSPC since 2019. *Id.* ¶13. NUBEQA has been FDA-approved for that use since 2025. *Id.* ¶16.

To obtain these approvals, JBI and Bayer were both required to conduct rigorous clinical trials reviewed by FDA. JBI's trial of ERLEADA for mCSPC doublet therapy showed a statistically significant improvement of at least a 33% reduction in the risk of death compared to placebo alongside ADT. *Id.* ¶13. By contrast, Bayer's trial of NUBEQA for this use showed *no* statistically significant improvement in overall survival. *Id.* ¶¶16-17.

### B. Clinical Trials Versus Real-World Data

In pharmaceutical research, the "gold standard" is the clinical trial: a study where subjects are randomly and prospectively assigned to treatment groups. Clinical trials avoid bias via randomization, which creates study groups balanced for relevant risk factors. Daniel Malone Declaration ("Malone") ¶9; Morrow ¶24. But clinical trials are expensive and time-consuming, and their participants may not represent real-world populations. Robert Gibbons Declaration ("Gibbons") ¶22; Malone ¶¶12-14.

Another important type of pharmaceutical research is retrospective studies—analyses of historical data, such as medical or insurance records. Because they rely on treatment in actual medical practice, retrospective studies are often called "real-world" studies. Malone ¶8; Morrow ¶23. Real-world studies have advantages such as speed and lower cost, and can be more representative of real patient populations. Malone ¶¶12-14; Morris ¶¶60, 66. But they use data from actual healthcare decisions, which are not random. Morrow ¶23. This creates a risk of confounding: bias that occurs when the two treatment groups are unbalanced with respect to some variable that affects the outcome. Gibbons ¶¶13-14; Morrow ¶23. Trained physicians are well aware of this risk. Drake ¶¶32-34; Morris ¶¶61, 65, 83.

Importantly, bias in real-world studies can be minimized. Through statistical methods that control for confounding factors, real-world studies can approximate randomized trials and "have the potential to measure causality." Malone ¶16. Real-world studies thus provide valuable clinical information, which can include credible evidence of treatment safety and efficacy. Malone ¶¶8, 11-12; Daniel Troy Declaration ("Troy") ¶¶48-55.

Bayer agrees. As Bayer's Oncology group recently observed, real-world evidence "complements evidence from clinical trials" and "[s]upports everyday clinical decision-making." Malone ¶44. Bayer conducts and publishes real-world studies to compare its own medications to competitors', using many of the same statistical methods and datasets it derides here. *Id.*; Morrow ¶101; Gibbons ¶¶26, 39.

## C.   The Study at Issue

JBI sponsored a real-world study comparing overall survival in mCSPC patients treated with ERLEADA and NUBEQA without docetaxel. Morrow ¶¶20-21. The lead author was Benjamin Lowentritt, M.D., a board-certified urologist and President of the American Urological Association, Mid-Atlantic Region. *Id.* ¶18. He had previously published other real-world studies in prostate cancer—including one sponsored by Bayer, relating to NUBEQA. Malone ¶44; Morrow ¶¶18, 86 n.25; Morris ¶85 n.5.

### 1.   Methodology

The Study was designed as a retrospective, observational study using real-world data. Morrow ¶23. Its primary endpoint was overall survival through up to 24 months of follow-up, meaning from day one of a patient's treatment with ERLEADA or NUBEQA through the following 24 months or the Study's end date, whichever occurred first. *Id.* ¶22. The Study analysis "is consistent with broadly accepted standards for [real-world] studies." Malone ¶¶22-24; Morrow ¶¶29, 39, 41.

The Study data came from anonymized treatment records in two widely used research databases, which JBI linked to give a fuller picture of each patient's health. Malone ¶26; Morrow ¶¶34-35; Morris ¶79. That data spanned from January 1, 2016 through June 30, 2025, though data from before August 4, 2022—the date that NUBEQA was approved for treatment of mCSPC with docetaxel—were used only to identify baseline characteristics and comorbidities, not to compare survival rates. Morrow ¶36.

Up-front "power" calculations were performed to determine how many patients would be necessary to detect a statistically significant difference between treatment groups. Morrow ¶29. The patient pool was then narrowed based on various qualifying criteria. *Id.* ¶36. This produced two cohorts: 1,460 ERLEADA patients and 287 NUBEQA patients. *Id.* ¶37. That exceeded the necessary size by over 400 patients. *Id.* ¶¶33, 37.

To minimize confounding, the Study authors ensured the cohorts were balanced using a technique called inverse probability of treatment weighting ("IPTW"). Morrow ¶39; Gibbons ¶20. IPTW is routinely used (including by Bayer) to control for confounding variables in observational studies. Malone ¶¶23, 44; Gibbons ¶14. The Study controlled for all major variables that might affect overall survival—including age, race, geography, cancer severity, and 17 comorbid conditions. Morrow ¶¶40-41; Morris ¶¶83-86.

## 2. Conclusions

Out of all patients in the study cohorts, the estimated overall survival rates through 24 months of follow-up were 92% in the ERLEADA cohort and 86% in the NUBEQA cohort. Thus, the difference in *absolute survival rates* was 6%. Morrow ¶43. It is standard practice in survival studies to report cross-cohort comparisons of the reduction in risk of death using a different metric: the *hazard ratio*. Gibbons ¶¶15-16, 52-53; Morrow ¶45.

The hazard ratio is calculated using a well-known statistical approach called the Cox proportional hazards model. Gibbons ¶20; Morrow ¶45. The Study used a weighted Cox proportional hazards model to account for confounding variables associated with observational, retrospective studies. Gibbons ¶20; Morrow ¶¶45, 118. Here, this approach yielded a hazard ratio of 0.49. Gibbons ¶21; Morrow ¶¶45, 126. This means that, at any given moment during the observation period, an ERLEADA group member's chance of dying was 49% of that of a NUBEQA group member. Stated otherwise, the instantaneous rate of death was *51% lower* in the ERLEADA group (*i.e.*, 100% minus 49%). Gibbons ¶¶21, 31. Hence, the Study's top-line result: "In mCSPC patients[,] Apalutamide without docetaxel [demonstrated a] 51% reduction in risk of death using 24-month follow-up data vs Darolutamide without docetaxel." ECF 1-2 at 6.

### D. Communications About the Study

#### 1. The IPCU Presentation

On February 2, 2026, JBI presented a six-slide summary of the Study (the "Presentation") at the Annual International Prostate Cancer Update ("IPCU") in Vail, Colorado. Morrow ¶¶2, 52. IPCU is a medical congress attended by doctors who treat prostate cancer. *Id.* ¶49. Independent experts affiliated with IPCU peer-reviewed and approved a summary of the Study's background, methods, results, and conclusions. *Id.* ¶50. The Study was selected as one of the top two submitted to IPCU and was one of just three selected for a live podium presentation. *Id.* That Presentation remains available on a section of JBI's website restricted to medical professionals. Nicole Day Declaration ("Day") ¶6. It bears a watermark stating: "This material is distributed for scientific purposes...and is not for promotional use." *See generally* ECF 1-2.

The Presentation describes the Study as a "[r]eal-world," "retrospective" analysis based on medical records. *Id.* at 2-4. Its "Methods" slide names the databases from which the data were drawn and discloses the cohort sizes. *Id.* at 4. It further notes that the Study "[b]alanced

confounding baseline variables" using IPTW and used the "[w]eighted Cox proportional hazards model" to "[c]ompare OS [overall survival] between cohorts." *Id.* The "Results" slide notes that IPTW was used to control for confounders and lists which were controlled for (and, by omission, which were not). *Id.* at 5.

The "Limitations and conclusions" slide provides the top-line result: in this particular group, patients receiving "[a]palutamide without docetaxel" had a "51% reduction in the risk of death" versus those receiving "[d]arolutamide without docetaxel." *Id.* at 6. This slide prominently lists four reasons these results may not be definitive: the "[p]otential for misclassification bias"; the "[p]ossibility that not all death or treatment data [were] captured" in the databases; the possibility that "[u]nknown confounders" not controlled for "may be present"; and the possibility that "[l]onger follow-up may be required." *Id.*

## 2. The Overview Slide

J&J also placed a one-slide summary of the Study (the "Overview Slide") on its website restricted to physicians. Morrow ¶66; Day ¶6. It, too, bears a watermark stating it is "for scientific purposes," "not for promotional use." Morrow Ex. 3. It includes a QR code inviting readers to "Scan...for the full oral presentation," which links to the Presentation. *Id.*

The Overview Slide states that, in this "[r]eal-world comparison," the "patients who started treatment with apalutamide (without docetaxel) were less likely to die than those who started darolutamide (without docetaxel)." *Id.* It summarizes the methodology. *Id.* It discloses the cohort sizes. *Id.* It notes that the data "came from US medical and insurance databases." *Id.* And it lists several "limitations," including "missing or incorrect" information in the underlying "clinical records"; the possibility that the patients in the study "may not represent" the broader population; and the potential need for "[l]onger follow-up...to fully understand" the differences. *Id.*

### 3. The Press Release

On February 2, 2026, J&J issued a press announcement (the "Press Release"). Morrow ¶72. It stated that, in this "real-world," "retrospective," "observational" study, patients "initiating ERLEADA® without docetaxel experienced a statistically significant 51 percent reduction in the risk of death compared to those who initiated on darolutamide without docetaxel." Morrow Ex. 4. It emphasized the Study was not a "randomized controlled trial[]" and the "absence" of such trials comparing the medications. *Id.* It noted the cohort sizes. *Id.* It disclosed that the data were drawn from "large, contemporary U.S. datasets." *Id.* It noted that the 51% reduction calculation was derived from the "hazard ratio [of] 0.49," not the *absolute* difference in mortality between cohorts. *Id.* And it acknowledged that the Study had "limitations," including "potential miscoding or missing information in the data sources." *Id.*

### E. Procedural History

On February 6, 2026, Bayer's counsel sent a letter "demand[ing] that [JBI] immediately discontinue" use of all materials relating to the Study and "issue a public retraction and correction." ECF 17-4 at 2, 7. On February 13, 2026, JBI sent a response refuting Bayer's critiques and "declin[ing] to cease using or retract" the materials. Jonah M. Knobler Declaration ("Knobler") Ex. 1 at 24. JBI also noted that Bayer's own studies suffered from the same purported flaws as JBI's, and that Bayer had falsely advertised NUBEQA in multiple ways. Knobler ¶5.

Nonetheless, JBI offered to consider any disclaimers or clarifications Bayer might suggest. Bayer never proposed any. Nor did Bayer substantively respond to JBI's detailed rebuttal of Bayer's critiques of the Study. Knobler ¶¶7, 10-11. Instead, on February 23, 2026, Bayer sued.

## LEGAL STANDARD

"[A] preliminary injunction is an extraordinary and drastic remedy" that "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v.*

*Armstrong*, 520 U.S. 968, 972 (1997). The plaintiff "must establish [(1)] that he is likely to succeed on the merits, [(2)] that he is likely to suffer irreparable harm in the absence of preliminary relief, [(3)] that the balance of equities tips in his favor, and [(4)] that an injunction is in the public interest." *Daileader v. Certain Underwriters at Lloyds London*, 96 F.4th 351, 356 (2d Cir. 2024). This is a "demanding" standard. *Id.* "[E]ven upon [a] showing [of all four factors], whether to grant the injunction still remains in the 'equitable discretion' of the court." *Christopher Phelps & Assocs., LLC v. Galloway*, 492 F.3d 532, 543 (4th Cir. 2007) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 394 (2006)).

## ARGUMENT

### I. THIS COURT IS AN IMPROPER FORUM FOR THIS DISPUTE

A "[c]ourt cannot enter injunctive relief—even preliminarily—before addressing challenges to personal jurisdiction and venue." *Moog Inc. v. Skyryse, Inc.*, 2022 WL 17720965, at *6 (W.D.N.Y. Dec. 15, 2022) (*citing Lam Yeen Leng v. Pinnacle Performance Ltd.*, 474 F. App'x 810, 813 (2d Cir. 2012)). The plaintiff must "establish...at least a reasonable probability of ultimate success upon the question of jurisdiction." *Homeschool Buyers Club, Inc. v. Brave Writer, LLC*, 2020 WL 1166053, at *7 (S.D.N.Y. Mar. 11, 2020). Otherwise, the "district court is powerless to proceed on [the] motion." *CleanSpark, Inc. v. Discover Growth Fund, LLC*, 485 F. Supp. 3d 494, 500 (S.D.N.Y. 2020) (cleaned up).

New York courts[1] may exercise personal jurisdiction over non-residents in two ways: "general jurisdiction pursuant to...C.P.L.R. § 301 or specific jurisdiction pursuant to...C.P.L.R. §

---

[1] Because the Lanham Act has no jurisdictional provision, "courts...apply the personal jurisdiction rules of the forum state." *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 35 (2d Cir. 2010).

302." *Washington v. Networks Presentations*, 2025 WL 968741, at *3 (S.D.N.Y. Mar. 31, 2025) (cleaned up). The Complaint fails to establish either.

### A. General Jurisdiction

CPLR § 301 confers general jurisdiction "only if" a corporation is "essentially at home in the forum State." *Hartford Fire Ins. Co. v. Maersk Line*, 2019 WL 4450639, at *5 (S.D.N.Y. Sept. 17, 2019). "[E]xcept in a truly 'exceptional' case, a corporate defendant [is] 'essentially at home' only where it is incorporated or maintains its principal place of business." *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 627 (2d Cir. 2016); *see Daimler AG v. Bauman*, 571 U.S. 117, 139 n.19 (2014). Neither J&J nor JBI is incorporated or maintains its principal place of business in New York. Compl. ¶¶18-19. Bayer cites no "exceptional" reason why Defendants are nevertheless "at home" here—and there is none. It is not enough that Defendants "carr[y] on significant business in the state," as alleged. *Christie v. Hyatt Corp.*, 2024 WL 2387513, at *3 (E.D.N.Y. May 23, 2024) (cleaned up). General jurisdiction is a non-starter.

### B. Specific Jurisdiction

The Complaint also fails to establish specific jurisdiction, which is "confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Bristol-Myers Squibb Co. v. Superior Court*, 582 U.S. 255, 262 (2017). Absent that connection, "specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State." *Id.* at 264.

Relevant here, New York courts may exercise specific jurisdiction when a cause of action "arise[s] from" or relates to a defendant's "transact[ion of] any business within the state or contract[ing] anywhere to supply goods or services in the state."[2] C.P.L.R. § 302(a)(1). Section

---

[2] Section 302(a) also confers specific jurisdiction when claims "arise from" a defendant's commission of a tort within New York, commission of a tort outside New York causing injury

302(a)(1) "requires both (i) purposeful activity by the defendant in New York and (ii) a substantial relationship between that activity and the plaintiff's claims." *Aprahamian v. Sandoz, Inc.*, 2026 WL 221286, at *4 (S.D.N.Y. Jan. 28, 2026). Neither exists here.

Bayer's allegations about sales of ERLEADA "in the U.S. market" (Compl. ¶¶18-19) establish, at best, that Defendants "target[]...the United States market as a whole, which incidentally includes New York." *Ziboukh v. Whaleco, Inc.*, 795 F. Supp. 3d 349, 378 (E.D.N.Y. 2025). That's insufficient: courts reject allegations that "fail[] to distinguish...between [defendant's] commerce in New York and commerce in the United States...generally." *Megna v. Biocomp Labs., Inc.*, 166 F. Supp. 3d 493, 498 (S.D.N.Y. 2016); *see Creative Photographers, Inc. v. Grupo Televisa, S.A.B.*, 763 F. Supp. 3d 618, 634 (S.D.N.Y. 2025) (where "th[e] alleged behavior is indistinguishable from Defendant's interaction with...any other jurisdiction," there is no "indicat[ion] [that] Defendant purposefully availed itself of [New York]").

Economic activity in New York does not create jurisdiction under section 302(a)(1) if it is unrelated to the claims alleged. *See, e.g.*, *NewMarkets Partners LLC v. Sal. Oppenheim Jr. & CIE*, 638 F. Supp. 2d 394, 403 (S.D.N.Y. 2009) ("[CPLR] 302(a)(1) does not provide a basis for personal jurisdiction" where "investments [by defendant] in New York-based funds" have "no nexus...[to] the [false advertising and unfair competition] claims at issue."). So too here. Bayer's claims do not "arise from" the *sale* of ERLEADA in New York (or anywhere), but from the Press Release, Overview Slide, and Presentation, which have no connection to New York. Day ¶¶6-11; Ann Marie Gray Declaration ("Gray") ¶¶3-6; *see Real Selling Grp. LLC v. ESN Grp., Inc.*, 2021

within New York, or ownership/use of New York real property. *See* C.P.L.R. § 302(a)(2)-(4). Nothing in the Complaint suggests such facts. Moreover, Bayer's claims here "sound[] in defamation," *ONY*, 720 F.3d at 492, and are thus "explicitly exempt" from Sections 302(a)(2) and (a)(3). *See G31000 N. Am., Inc. v. Paris*, 2014 WL 6604790, at *2 (S.D.N.Y. Nov. 21, 2014) (*quoting Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 244-45 (2d Cir. 2007)).

WL 535748, at *6 (S.D.N.Y. Feb. 12, 2021) (no § 302(a)(1) jurisdiction where Defendant's "sales in New York have nothing to do with" Lanham Act and GBL claims).

## C. Venue

Alternatively, the Court should transfer or dismiss for improper venue. Venue lies in "(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred…; or (3) if there is no district in which an action may otherwise be brought..., any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action." *Smith v. PacerMonitor, LLC*, 2020 WL 702224, at *2 (S.D.N.Y. Feb. 12, 2020) (citing 28 U.S.C. § 1391(b)). Courts must "construe the venue statute strictly." *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 357 (2d Cir. 2005).

Bayer's conclusory allegation that "J&J…markets and sells [ERLEADA] in this district" (Compl. ¶16) "does not suffice to meet the venue statute's strict requirements." *Mergenthaler v. Zimbler*, 2025 WL 1358518, at *14 (E.D.N.Y. Jan. 30, 2025). First, Bayer cannot establish venue based on Defendants' residence, *see* 28 U.S.C. § 1391(b)(1), because Defendants are not residents of New York, *see Barrett v. Uber Techs. Inc.*, LLC, 2025 WL 3538599, at *4 (S.D.N.Y. Dec. 10, 2025) (no venue under § 1391(b)(1) where "the corporate defendants are incorporated and headquartered outside New York").

Second, Bayer cannot show that a *substantial* part of the events giving rise to its claims occurred in this District. 28 U.S.C. § 1391(b)(2). The Second Circuit has "caution[ed] district courts to take seriously the adjective 'substantial.'" *Gulf Ins.*, 417 F.3d at 357. "[F]or venue to be proper, significant events or omissions material to the plaintiff's claim must have occurred in the district in question." *Doe 1 v. Congregation of Sacred Hearts of Jesus & Mary*, 2023 WL 185496, at *2 (S.D.N.Y. Jan. 13, 2023) (cleaned up).

Bayer does not allege that *any* events concerning the Press Release, Presentation, or Overview Slide occurred in this District—and none did. Day ¶¶6-11; Gray ¶¶3-6. Venue is thus improper. *See Wohlbach v. Ziady*, 2018 WL 3611928, at *4 (S.D.N.Y. July 25, 2018) (no venue in New York where "all of the events upon which [plaintiff] premises her allegations occurred in Delaware").

Finally, Bayer cannot rely on Section 1391(b)(3) because it cannot show that there is no other district—such as one in the Third Circuit, where Defendants both reside—where this action could have been brought.

In sum, the only reason this case is before this Court is that Bayer engaged in impermissible forum shopping. That, in itself, dooms Bayer's motion.

## II. BAYER HAS NOT SHOWN LIKELY SUCCESS ON THE MERITS

To prevail here, Bayer must make a clear showing of likely success on the merits. It cannot do so for three reasons. First, the challenged statements are protected by the First Amendment. Second, Bayer cannot show the statements are "literally false"—the only Lanham Act theory it advances. Finally, Bayer's hands are unclean.

### A. The Challenged Statements Are Protected By The First Amendment

Lanham Act liability is limited to statements "in commercial advertising or promotion." 15 U.S.C. § 1125(a)(1)(B); *see Boule v. Hutton*, 328 F.3d 84, 95 (2d Cir. 2003) (Calabresi, J., concurring). Speech is "commercial" if it "relate[s] solely to the economic interests of the speaker and its audience." *Conn. Bar Ass'n v. United States*, 620 F.3d 81, 94 (2d Cir. 2010).

Most of the challenged speech is non-commercial, because it does not "relate solely"—or even primarily—to "economic interests." This includes JBI's presentation at IPCU following peer review and JBI's placement of the Presentation and Overview Slide on its physicians-only website, explicitly restricted to non-promotional scientific use (*supra* at 7-8). *See Bracco Diagnostics, Inc.*

*v. Amersham Health, Inc.*, 627 F. Supp. 2d 384, 457 (D.N.J. 2009). The only communication that is arguably "commercial" is the Press Release.

But even commercial speech technically within the Lanham Act's scope enjoys constitutional protection. Indeed, "[s]peech in aid of pharmaceutical marketing...is a form of expression protected by the Free Speech Clause of the First Amendment." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 557 (2011). Thus, "free speech principles" must "inform [courts'] interpretation of the [Lanham] Act," and courts must be "careful not to permit overextension of the Lanham Act to intrude on" scientific debate. *ONY*, 720 F.3d at 496.

The Second Circuit's *ONY* decision is squarely on point. There, defendant commissioned a study comparing the parties' medical products, which found that plaintiff's "was associated with [a] greater likelihood of death." *Id.* at 494. That study was presented at medical conferences, published in a peer-reviewed journal, and touted in a press release and promotional materials. *Id.* at 494-95. The Second Circuit found *all* this speech "protected under the First Amendment" and "not grounds for a claim of false advertising under the Lanham Act" or state law. *Id.* at 496-98.

It emphasized that the statements were "directed to the relevant scientific community"; that the study had been peer-reviewed, signifying "at least some degree of basic scientific competence"; and that the "methodology" was disclosed. *Id.* Thus, the plaintiff was free to "analyz[e] or refut[e] the soundness of the experimental design or the validity of the inferences drawn from the results," and the "scientific public" could draw its own conclusions. This went not only for the study itself, but also the defendant's "distribut[ion of] the article's findings for promotional purposes," to the extent those "materials [accurately stated] the article's conclusions." *Id.* at 498-99.

Similarly, in *Pacira BioSciences, Inc. v. Am. Soc'y of Anesthesiologists, Inc.*, 63 F.4th 240 (3d Cir. 2023), a pharmaceutical company sued for trade libel over an analysis published in a medical journal and reiterated in Continuing Medical Education programs and a podcast. *Id.* at 243-44. The defendant had allegedly employed "flawed method[s]"—such as "fail[ing] to isolate certain variables"—thereby "reach[ing] unqualified conclusions about" the plaintiff's medication. *Id.* The Third Circuit found these statements "nonactionable opinions" protected by the First Amendment. *Id.* at 245. It held that "mere disputes about the reliability of a scientific study's disclosed methodology cannot create an actionable falsehood"; such disagreements are matters for "scholarly debate" and "not fit for resolution" by courts. *Id.* at 247-48 (cleaned up).

These cases control here. JBI's Presentation occurred at a scientific conference following peer review. Morrow ¶¶49-50. Its methodology and limitations are disclosed. Morrow ¶¶54-56, 64; Malone ¶20; Gibbons ¶¶29-30. The remaining statements are republications or accurate descriptions of that information. *See Cassava Sciences, Inc. v. Bredt*, 2024 WL 1347362, at *16 (S.D.N.Y. Mar. 28, 2024) ("republications of scientific conclusions are [also] protected under *ONY*," including a "press release"); *Express Gold Cash, Inc. v. Beyond 79, LLC*, 2019 WL 4394567, at *6 (W.D.N.Y. Sept. 13, 2019) (per *ONY*, "a false advertising claim will not lie where the defendant has done nothing more than accurately present a study's conclusions, even if...flawed").

JBI's speech is thus non-actionable under *ONY* and *Pacira*. The proper forum for Bayer to challenge this speech is before the "jury" of the "scientific public." *ONY*, 720 F.3d at 497.

### B.     The Challenged Statements Are Not False

#### 1.     Legal Standards

To prevail on a Lanham Act false-advertising claim, Bayer must show that JBI made a statement (1) in commercial advertising or promotion; (2) that is literally false or misleading; (3)

that is material; and (4) that injured or will likely injure to Bayer. *Church & Dwight Co. v. SPD Swiss Precision Diagnostics*, *GmBH*, 843 F.3d 48, 65 (2d Cir. 2016). Bayer cannot prove these elements with respect to *any* of the challenged materials—let alone *all* of them.[3]

The Lanham Act proscribes both "literally false" statements and "misleading" ones. *Id.*[4] Critically, Bayer proceeds only on a theory of literal falsity—it makes no claim that the challenged materials are misleading. ECF 7 ("Br.") at 13, 16-19. But the test for literal falsity is "rigorous," *Buetow v. A.L.S. Enters., Inc.*, 650 F.3d 1178, 1185 (8th Cir. 2011), and Bayer cannot meet it.

"A 'literal' falsehood is bald-faced, egregious, undeniable, over the top." *Schering-Plough Healthcare Prods. v. Schwartz Pharma, Inc.*, 586 F.3d 500, 513 (7th Cir. 2009). It requires a "patently false statement that means what [the plaintiff] says [it means] to any linguistically competent person." *Id.* "[I]f the language...is susceptible to more than one reasonable interpretation, [it] cannot be literally false." *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 158 (2d Cir. 2007). Crucially, if statements "reflect a reasonable difference of scientific opinion," they "cannot...be literally false." *In re GNC Corp.*, 789 F.3d 505, 515 (4th Cir. 2015).

When assessing literal falsity, a court "must analyze the message conveyed in full context." *Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 67 (2d Cir. 2016). This requires consideration of the whole document, not isolated phrases (as Bayer urges here). *Id.* Likewise, courts must consider "the audience to whom the advertising [is] conveyed." *Princeton Graphic*

---

[3] As Bayer recognizes, the standard for Bayer's state-law claims is identical, except that common-law unfair competition requires bad faith. Br. at 14. Bayer cannot succeed on these claims for the same reasons discussed below.

[4] A "literally false" statement may be made either expressly or "by necessary implication." *Zesty Paws LLC v. Nutramax Lab'ys, Inc.*, 157 F.4th 194, 198 (2d Cir. 2025). A statement is "conveyed by necessary implication" only "when, considering the advertisement in its entirety, the audience would [perceive] the claim as readily as if it had been explicitly stated." *J&J Vision Care, Inc. v. Ciba Vision Corp.*, 348 F. Supp. 2d 165, 182 (S.D.N.Y. 2004).

*Operating, L.P. v. NEC Home Elecs.*, 732 F. Supp. 1258, 1266 (S.D.N.Y. 1990); *see, e.g.*, *Am. Council of Certified Podiatric Phys. & Surgeons v. Am. Bd. of Podiatric Surgery*, 185 F.3d 606, 615-16 (6th Cir. 1999) (relying on fact that "the intended audience [was]...a sophisticated group of professionals" in finding no literal falsity); *Core-Vent Corp. v. Nobel Indus. Sweden A.B.*, 163 F.3d 605 (9th Cir. 1998) (relying on fact that statements were made "to a professional conference," "in a scientific journal," and to "dental labs" in finding same).

In this regard, courts routinely note that "[d]octors are sophisticated, knowledgeable consumers who are not easily misled." *Bracco Diagnostics*, 627 F. Supp. 2d at 476; *see Sandoz Pharms. Corp. v. Richardson-Vicks, Inc.*, 902 F.2d 222, 229-30 (3d Cir. 1990) (rejecting claim that a "well informed and sophisticated audience" of "pediatricians" would "believe that [defendant's] assertions...were supported by a greater degree of testing data than [defendant] actually had compiled" (cleaned up)).[5]

Lanham Act jurisprudence also distinguishes between "non-establishment" or "bald" claims (*e.g.*, "my product is better than yours") and "establishment" claims (*e.g.*, "*tests prove* my product is better than yours."). *Rhone-Poulenc Rorer Pharms., Inc. v. Marion Merrell Dow, Inc.*, 93 F.3d 511, 514-15 (8th Cir. 1996). A plaintiff challenging an establishment claim may prevail by demonstrating the deficiency of the advertiser's testing. *Id.*

Bayer argues that JBI's statements are "establishment" claims because they mention scientific testing—*i.e.*, the Study. But not all ads that mention tests make establishment claims—

---

[5] Bayer asserts that the audience for the challenged statements is not just physicians, but patients. It has no evidence that any patient reviewed these materials. In any event, "the therapeutic decision of...which drug to prescribe...is entrusted solely to physicians." *MSP Recovery Claims, Series LLC v. Takeda Pharms. Am., Inc.*, 2020 WL 13804744, at *2 (S.D.N.Y. 2020); *see* Drake ¶19; Morris ¶¶48-49. Any deception of patients, therefore, cannot be *material* or *injure* Bayer unless physicians are deceived.

only those that make unqualified statements like "*tests prove* X."[6]  Advertisements do not make

"establishment" claims when they merely describe the data or findings of a study.  *See Apotex Inc.*

*v. Acorda Therapeutics, Inc.*, 2014 WL 5462547, at *3 (S.D.N.Y. Oct. 23, 2014), *aff'd*, 823 F.3d

51 (2d Cir. 2016).  That is all the challenged communications do, so Bayer cannot invoke the

"establishment claim" doctrine.  And even if it could, Bayer still could not prove literal falsity

under the standard governing such claims.  *Infra* at 22-29.

### 2.  None of the Challenged Materials Are Literally False

Bayer analyzes the challenged materials through the lens of two supposed "claims": a

"Death Risk Claim" and a "Robustness Claim."  This is improper.  Courts review each challenged

document as a whole—not isolated statements plucked from a larger document, and not "claims"

distilled from an assemblage of documents.  The proper unit of analysis is the entire individual

document.  *See J&J Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247-48 (11th Cir.

2002); *Apotex*, 823 F.3d at 67.  Bayer cannot show that any of the challenged documents, viewed

as a whole, contains falsehoods.

### a.  The IPCU Presentation

The Presentation makes no unqualified "Death Risk Claim," as Bayer contends.  It does

not assert definitively that ERLEADA "cut[s] the risk of death in half relative to NUBEQA®," Br.

at 3—let alone that "*tests prove*" this absolute claim.  Read in full, the Presentation says that, in

the particular group of patients observed in one real-world study, "Apalutamide without docetaxel

---

[6] *See, e.g.*, *Procter & Gamble Co. v. Chesebrough-Pond's, Inc.*, 747 F.2d 114, 116, 119 (2d Cir. 1984) ("[D]ermatologists *proved it in clinical tests*.  New Wondra improves the condition of rough dry skin better."); *Castrol, Inc. v. Quaker State Corp.*, 977 F.2d 57, 59 (2d Cir. 1992) ("*[T]ests prove* Quaker State 10W–30 protects better than any other...motor oil"); *McNeil-P.C.C.*, 938 F.2d at 1546 ("[I]n doctor supervised clinical studies...AF Excedrin *was shown* to provide greater headache relief" than ES Tylenol.").

[showed a] 51% reduction in the risk of death using 24-month follow-up data vs Darolutamide without docetaxel." ECF 1-2 at 6. That truthfully "report[s] 'exactly what the study shows, so it cannot be literally false.'" *In re Riddell Concussion Reduction Litig.*, 121 F. Supp. 3d 402, 416 (D.N.J. 2015).

Moreover, the Presentation's findings are qualified in multiple ways. *See ONY*, 720 F.3d at 494 (no Lanham Act liability where "[t]he article's conclusions were not unqualified" and text noted that "the retrospective nature of the study" might introduce confounding). The Presentation also discloses the methodology behind the Study's result. Its sophisticated audience is thus "in the position to decide for themselves" how persuasive it is. *Pfizer Inc. v. Miles, Inc.*, 868 F. Supp. 437, 454-56 (D. Conn. 1994); *Core-Vent*, 163 F.3d at 605.

Even without disclosures, cancer physicians know the limitations of real-world analyses. Drake ¶¶32-34; Morris ¶¶54-65, 72-74. "Since physicians are...aware of the[se] inherent limitations," they are also "aware that the 'propositions for which [real-world studies] are cited'...are necessarily qualified." *Pfizer*, 868 F. Supp. at 455-56; *see also Kurin, Inc. v. Magnolia Med. Techs., Inc.*, 473 F. Supp. 3d 1117, 1130-32 (S.D. Cal. 2020) (since physicians are "familiar" with the difference between controlled and non-controlled studies, disclosed use of one type of study cannot "render[]...advertising literally false").

At minimum, Bayer's reading is not *mandated* by the Presentation's language and context, which precludes a finding of literal falsity. *See, e.g.*, *Core-Vent*, 163 F.3d at 605 (no literal falsity where article disclosed study's limitations); *Nationwide Tarps, Inc. v. Midwest Canvas Corp.*, 244 F. Supp. 2d 14, 16-18 (N.D.N.Y. 2003) (no literal falsity where defendant's "claims [were] qualified" and did not represent results were generalizable).

### b. The Overview Slide

Like the Presentation, the Overview Slide does not make an absolute "Death Risk Claim." It states that, in this particular "[r]eal-world comparison," the "patients who started treatment with apalutamide (without docetaxel) were less likely to die than those who started darolutamide (without docetaxel)." It prominently discloses "limitations" that preclude a finding of literal falsity. And it invites readers to scan its QR code that links directly to the full Presentation, with additional detail and disclosures. *See Broadspring, Inc. v. Congoo, LLC*, 2014 WL 7392905, at *2-3 (S.D.N.Y. Dec. 29, 2014) (any "documents or materials to which the [challenged] statements...hyperlink" are part of the "full context" in which a court "must analyze the message conveyed"). At minimum, Bayer's reading is not *mandated* by the full document, considering its sophisticated audience.

### c. The Press Release

Like the other challenged materials, the Press Release does not make an unqualified "Death Risk Claim." It states that, in this particular "real-world" analysis, "patients with [mCSPC] initiating ERLEADA® without docetaxel experienced a statistically significant 51 percent reduction in the risk of death compared to those who initiated on darolutamide without docetaxel." The Press Release identifies the Study as a "retrospective study" and emphasizes that it was *not* a "randomized controlled trial[.]" And it expressly notes "limitations" such as "missing information in the data sources." No one reading the Press Release as a whole could think that JBI had made a definitive, unqualified claim of test-proven "Death Risk" superiority. At minimum, such a reading is not *mandated* for *all* readers, as required for literal falsity.

Bayer also asserts that the Press Release makes a "Robustness Claim." Br. at 18-19. The Press Release says the Study was "[d]esigned to meet rigorous FDA guidance and robust methodological framework on real-world evidence," and immediately goes on to explain what this

means: the Study "included a pre-specified protocol, pre-specified primary endpoint of overall survival (OS), [a] power calculation, and propensity score matching through...IPTW." ECF 1-1 at 4. Bayer does not dispute that the Study used these techniques, which FDA in fact encourages in its framework on real-world evidence. Malone ¶¶22, 43; Troy ¶¶48-90.

Bayer may disagree that this is enough to make a study "rigorous" or "robust." As courts routinely note, however, those are subjective terms that cannot mislead—let alone be proven literally false. *See, e.g.*, *Sherman v. Abengoa, S.A.*, 156 F.4th 152, 164 (2d Cir. 2025) (claim of a "robust project management and control system" was "inactionable puffery," because "robust" is a "[v]ague" and "general" term); *In re Philip Morris Int'l Inc. Sec. Litig.*, 437 F. Supp. 3d 329, 350-51 (S.D.N.Y. 2020) (same for "rigorous"). And Bayer's argument that the Study was *not* "[d]esigned to meet" FDA's "rigorous...framework on real-world evidence" is essentially a restatement of its theory that the Study was methodologically deficient. Because, as explained below, that theory fails, its "Robustness Claim" theory fails too.

### 3. Bayer's Methodological Critiques Lack Merit

Even if the challenged materials contained "establishment claims"—such that methodology were relevant—Bayer could not show literal falsity.

Bayer would need to "demonstrate that [JBI's] tests are not sufficiently reliable to permit one to conclude with reasonable certainty that they established the claim made." *McNeil*, 938 F.2d at 1549 (cleaned up). "To ensure vigorous competition and to protect legitimate commercial speech, courts applying this standard should give advertisers a fair amount of leeway[.]" *Rhone-Poulenc*, 93 F.3d at 515. Thus, as the Second Circuit has emphasized, "a plaintiff must do more than show that the tests supporting the challenged claim are unpersuasive." *McNeil*, 938 F.2d at 1549; *see also In re Riddell*, 121 F. Supp. 3d at 415 ("merely identifying certain flaws...is

insufficient"); *Munchkin, Inc. v. Playtex Prods., LLC*, 2011 WL 2174383, at *4 (C.D. Cal. Apr. 11, 2011) ("expos[ing] methodological weaknesses" not enough).

Rather, Bayer must identify defects that are so "fundamental," *Kurin, Inc. v. ICU Med., Inc.*, 2024 WL 5416672, at *12 (C.D. Cal. Nov. 8, 2024), or so "conclusive," *Rhone-Poulenc*, 93 F.3d at 515, that they render the Study essentially "worthless," *Procter & Gamble*, 747 F.2d at 117, or "irrelevant," *Munchkin*, 2011 WL 2174383, at *5-6. Moreover, Bayer cannot merely *speculate* as to the impact of the asserted defects—which is all it has done. Gibbons ¶28. It must *demonstrate* that they undermine the Study's results. *See Core-Vent*, 163 F.3d at 605 (rejecting plaintiff's methodological complaints where it failed to offer "evidence of what effect (if any) [the errors] would make in [the] overall outcome").

Applying these standards, courts have found that plaintiffs did *not* meet their burden by:

- Showing that some data were "excluded" without disclosure; that the study criteria were chosen *ad hoc* rather than taken from existing literature; that the investigator "fail[ed] to maintain written records"; and that the investigator "fail[ed] to report" certain "surgical errors";[7]

- Showing that a study was a "'cohort study' as opposed to a random study"; that the helmets tested were "refurbished" rather than new; that "the authors disregarded 15% of the collected data without sufficient explanation"; and that "initial data failed to show a statistically significant difference between the [products]";[8]

- Showing that a study relied on "skewed" data; that the investigators "did not control for" certain relevant variables; that they "took measurements" at an inappropriate "point[] in time"; and that they "failed to...eliminate...investigator bias."[9]

Bayer's methodological critiques fare no better. Preliminarily, the Study's methods and conclusions were approved by IPCU after peer-review. Morrow ¶50. That alone undermines

---

[7] *Core-Vent Corp.*, 163 F.3d at 605.

[8] *In re Riddell Concussion Reduction Litig.*, 121 F. Supp. 3d at 406.

[9] *Gillette Co. v. Norelco Consumer Prods. Co.*, 946 F. Supp. 115, 123-27 (D. Mass. 1996).

Bayer's critiques. *See ONY*, 720 F.3d at 497 (publication in peer-reviewed forum "demonstrates at least some degree of basic scientific competence"); *Riddell, Inc. v. Schutt Sports, Inc.*, 724 F. Supp. 2d 963, 974 (W.D. Wis. 2010) ("fact that a peer-reviewed article was approved for publication is some evidence that the study is reliable" (citing *Daubert*)).

Regardless, the purported flaws Bayer asserts are not enough to prevail on a claim of literal falsity—especially given the extreme sophistication of JBI's audience and the fact that most (if not all) of the supposed flaws are expressly disclosed. *See Biolase, Inc. v. Fotona Proizvodnja Optoelektronskih Naprav D. D.*, 2014 WL 12579802, at *5 (C.D. Cal. June 4, 2014) (finding that "the sophisticated audience...would [not] be deceived, since dentists would likely be educated enough to see the alleged weaknesses in the studies"). Moreover, *Bayer itself* routinely publishes real-world studies with the same purported flaws it decries here. Malone ¶44; Morrow ¶¶101, 104; Gibbons ¶¶26, 33, 37, 39, 52; *see* Morris ¶¶85, 92-98. Not only does this render Bayer's hands unclean, *infra* at 31-32, it is strong evidence they are not flaws at all.

### a. Ability to Infer Causation

Bayer asserts that JBI's statements are "literally false" because the Study shows only that the ERLEADA patients had a 51% reduction in risk of death compared to the NUBEQA patients—not that this difference "was a *consequence*" of the treatment chosen. Br. at 17-18. But the challenged documents make no claims of definitive causation. They acknowledge the Study was observational and not a clinical trial; disclose its methodology and limitations; and leave it to the expert audience to decide how strong a causal link to infer.

Anyhow, the Study did not *merely* observe differences between the cohorts. Using IPTW, it measured and controlled for all major confounding variables. Gibbons ¶20; Malone ¶23; Morrow ¶¶40-41. This process was designed to ensure that the observed differences were *not* due to those extraneous variables—thus rendering it likely (even if not definitive) that they were due

to the differing treatments. Bayer knows this is how IPTW works, because it uses IPTW for the same purpose in its own real-world studies comparing treatments. Malone ¶44; Gibbons ¶26. Independent experts, including FDA, agree that observational studies can provide circumstantial evidence of causation when such techniques are used. Malone ¶16; Morrow ¶¶28, 110.

Of course, in all observational research, residual confounding may impact causal inferences. But any physician knows that. Morris ¶¶65, 83. That cannot make a study unreliable, let alone "literally false." *See In re Abilify (Aripiprazole) Prods. Liab. Litig.*, 299 F. Supp. 3d 1291, 1325 (N.D. Fla. 2018) ("It cannot be said that [a study] which accounts for these major causal risk factors is unreliable...simply because it did not account for all possible confounders.").

### b. Off-Label Status of NUBEQA During Study Period

Bayer notes that, for much of the Study period, NUBEQA lacked FDA approval for use without docetaxel—*i.e.*, that patients were receiving NUBEQA "off-label." *See* Br. at 20-21. That much is true. Indeed, the Presentation *expressly notes* that NUBEQA was FDA-approved for doublet use in 2025, late in the Study period. Morrow ¶85.

But Bayer then makes an unsupported leap: merely because some NUBEQA patients received "off-label" treatment, they were "sicker" than ERLEADA patients, biasing the results. Bayer has no evidence of this. Off-label treatment is "an accepted and necessary" component of "the practice of medicine." *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 350 (2001). Indeed, cancer patients routinely receive off-label treatment. Morris ¶¶38-41. Thus, Bayer's assumption that off-label use means "sicker patients" is unwarranted.

Notably, Bayer has published its own study examining use of NUBEQA for mCSPC between July 1, 2019 and March 31, 2023—a period beginning more than three years before the Study's start date. Bayer concluded that NUBEQA was used "ubiquitously" as *both* doublet

therapy *and* triplet therapy during this period—indeed, more often as doublet therapy (off-label) than triplet (on-label). Morris ¶41; Morrow ¶86.

In all events, the Study controlled for the severity of patients' cancer, comorbidities, and other major markers of health—ensuring both cohorts were well-balanced. Gibbons ¶33; Morrow ¶¶40-41; Morris ¶¶83-86. Thus, there is zero basis to conclude that the NUBEQA group was "sicker." Morrow ¶¶86, 114; *cf.* Morris ¶40.

### c. Controlling for Non-Cancer-Related Comorbidities

Bayer asserts that the Study did not control for "non-cancer-related comorbidities" and speculates that this would have somehow disadvantaged NUBEQA. Br. at 21-22. It is speculation that this would have biased the results in this way. Bayer cannot meet its burden by suggesting that a purported shortcoming "could" or "might" have impacted the Study's results. *See Core-Vent*, 163 F.3d at 605 (asserted flaw did not render ad literally false, absent "evidence of what effect (if any) [it] would make in [the study's] overall outcome").

Bayer's assertion is also just wrong. The Study measured and controlled for comorbidities using the authoritative statistical measure designed for this purpose: the Quan-Charlson Comorbidity Index ("Quan-CCI"). Morrow ¶41. Quan-CCI provides a weighted index of 17 comorbid conditions that are *mostly* non-cancer-related—including heart disease, vascular disease, lung disease, diabetes, HIV/AIDS, and more. Morrow ¶41; *see* Gibbons ¶33; Morris ¶85. Bayer employs this same index in its own studies to control for comorbidities, including non-cancer-related ones. Morris ¶85 n.5.

Thus, the notion that JBI didn't control for "non-cancer-related comorbidities" is false. And JBI disclosed what variables it did, and did not, control for, including its use of Quan-CCI—so readers could not have been deceived. ECF 1-2 at 4-5; *see* Morris ¶85.

#### d. Size Disparity in Study Cohorts

Bayer complains that the study cohorts were lopsided, and asserts that such a disparity "*can skew statistical analyses.*" Br. at 22. Again, Bayer makes no attempt to show that such skewing actually *happened* here. That is fatal. *Core-Vent*, 163 F.3d at 605.

In reality, disparate cohort sizes are common in real-world studies, as they reflect real-world differences in treatment uptake. Malone ¶24; Morrow ¶98. Leading journals routinely publish studies with cohort disparities of this size or far larger. Gibbons ¶37; Morrow ¶101. And Bayer itself has published studies with comparable disparities. Malone ¶32; Morrow ¶101; Gibbons ¶37; Morris ¶¶93-94. As Bayer well knows, cohort-size differences do not undermine validity when studies prespecify and correctly implement appropriate statistical methods, as JBI did here. Gibbons ¶¶35-37; Morrow ¶¶97, 99-100.

Bayer's speculation, in other words, is not just unsupported: it is wrong. Regardless, the size disparity was prominently disclosed in the challenged materials, permitting readers to decide for themselves how much this matters. Morrow ¶101.

#### e. 24-Month Follow-Up Period

Bayer asserts the challenged materials are "false" because they describe the Study as investigating survival "*through 24 months,*" when some patients had less than 24 months of follow-up. Br. at 23-24.

Bayer misconstrues common medical parlance. In survival analyses, "survival through X months" is routinely used to denote the *maximum* follow-up period specified by the study designers. Morrow ¶118. It is not a claim that *every* enrolled patient had that maximum amount of follow-up. Gibbons ¶¶41-43; Morris ¶¶87-89; Morrow ¶119. Indeed, it is inevitable that many patients will not—*e.g.*, because they entered the study late or switched insurance providers, or

because the study ended before they could reach the full follow-up time. Gibbons ¶43; Morris ¶89; Morrow ¶117.

Interpreting "survival through 24 months" as a maximum period and not a guarantee is standard in oncology and the target audience is familiar with this convention. Morrow ¶¶118-19. Moreover, the Presentation itself *precludes* Bayer's reading. Readers are explicitly told that about 37% of patients began treatment in 2024 and about 12% in 2025—less than 24 months from the Study's end. ECF 1-2 at 5. Just as Bayer noticed this fact, sophisticated physicians do too. Morris ¶89. They understand that "through 24 months" is not a universal guarantee that all patients received follow-up at 24 months. *Id.*

At minimum, the "through 24 months" statements cannot be *literally false*, because there is another permissible (indeed, superior) reading aside from Bayer's naïve one.

### f.    Hazard Ratio Critique

Bayer criticizes the Study for using a constant-hazard-ratio model, rather than one with a hazard ratio that fluctuates over time. *See* Br. at 23. This critique is unfounded.

The Cox proportional hazards model employed here inherently assumes a constant, time-invariant hazard ratio. Gibbons ¶48. That is the standard model used for oncology survival studies. Gibbons ¶¶48-50; Morrow ¶118. It "conveys the instantaneous relative risk of death [across the two cohorts] occurring throughout the entire study period." Gibbons ¶48. There is no reason to adopt a non-standard time-variant model here, since Bayer "provides no analysis showing a significant fluctuation in...the relative risks between" the two cohorts over time. *Id.* Indeed, the appearance of the Kaplan-Meier curves for each cohort affirmatively shows that the survival patterns in the two cohorts are *consistent* over time. Morrow ¶113; Gibbons ¶48.

And even if the actual survival patterns *did* vary over time—which Bayer has not shown— that would not make JBI's use of a single hazard ratio "false." That single hazard ratio would

accurately convey the weighted average of period-specific hazard ratios, which is truthful and useful information that physicians understand.  Gibbons ¶¶48-50; Morris ¶¶87-89.

### g.  Quality of Data Sources

Bayer asserts that the two datasets used in the Study data are flawed or incomplete.  No observational dataset is exhaustive.  But both of these datasets are commonly used in real-world analyses and widely accepted in scientific research.  Malone ¶¶27, 32, 34; Morrow ¶34; Gibbons ¶39.  Indeed, Bayer itself has relied on both in its own published studies. Malone ¶¶27, 34, 44; Morrow ¶104; Morris ¶¶93-97.  Bayer also ignores that JBI's linkage of the data from these two sources at the patient level provided a more comprehensive patient profile than using either dataset separately.  Morrow ¶¶94, 105; Malone ¶¶26, 33; Gibbons ¶40.  Regardless, JBI has been up-front about these datasets' limitations in all challenged materials.  Malone ¶29; Morrow ¶107.

### h.  Purported Inconsistency With Other Studies

Finally, Bayer states that prior studies of ERLEADA and NUBEQA have reached varying outcomes.  From this, Bayer leaps to the conclusion that this Study must be invalid, and discussing its results "false."  Br. at 24.

What is "false" is Bayer's claim that "multiple published Phase 3 randomized, double-blind clinical trials...have not shown any large difference in efficacy between apalutamide and darolutamide."  *Id.*  There have been *zero* "Phase 3 randomized, double-blind clinical trials" comparing these two medications.  Morrow ¶123; Morris ¶99.  That is why JBI's real-world analysis matters.[10]

---

[10] Bayer's statement that "NUBEQA® has independently shown an Overall Survival benefit as compared to placebo" is also flagrantly false.  Again, Bayer's own clinical trial found otherwise, and the National Comprehensive Cancer Network agrees that an "[overall survival] benefit has not been demonstrated" for NUBEQA.  Morrow ¶123.

Bayer also mischaracterizes the studies it cites. Among many other problems, Bayer cites studies examining outcomes in cancers *other* than mCSPC, the disease at issue. Malone ¶42; Morris ¶¶100-101. And it cites studies of patients with differing levels of disease severity and baseline health characteristics. Malone ¶42; Morris ¶¶100-101; Morrow ¶125. That the Study's results differed from those of non-comparable studies is not evidence of invalidity.

Bayer also ignores multiple publications whose results are *consistent* with the Study's. Morrow ¶126; Gibbons ¶¶57-59. Again, Bayer's own clinical trial of NUBEQA in doublet therapy showed *no* statistically significant benefit in overall survival, while JBI's corresponding trial of ERLEADA showed a statistically significant reduction in risk of death of at least *33%*. Morrow ¶13; Gibbons ¶¶57-59. Because these were gold-standard, FDA-supervised clinical trials, this fact alone makes the Study's findings plausible—indeed, any *other* result would be surprising. Morrow ¶126.

### 4. FDA's "Substantial Evidence" Standard Is Inapplicable

Bayer argues that JBI's statements do not comport with the FDA's "substantial evidence" standard. But JBI never claimed to meet this standard, which is irrelevant here in any event. Troy ¶¶34, 62-67, 85.

The Press Release states that the Study was "[d]esigned to meet rigorous FDA guidance...*on real-world evidence*." ECF 1-1 at 3. That same sentence explains what this means: "a pre-specified protocol, pre-specified primary endpoint, [etc.]." *Id.* There is no dispute the Study had these features, which are indeed part of the FDA's framework for real-world evidence. Malone ¶43; Troy ¶90. By contrast, JBI *did not* claim that the Study satisfied FDA's "substantial evidence" standard, which is a different—and irrelevant—regulatory provision.

The "substantial evidence" standard governs the approval of new drug indications and new claims in a drug's labeling under the Food, Drug, and Cosmetics Act. *See* 21 U.S.C. § 355(d); 21

C.F.R. § 314.126. It does not govern *all* speech about a medication, including truthful reporting of the results of individual studies. Troy ¶¶34, 37. Moreover, the Second Circuit has held that manufacturers may make truthful statements about their medications, *whether or not* such information appears in FDA-approved labeling—so the "substantial evidence" standard for labeling approval is irrelevant. *See United States v. Caronia*, 703 F.3d 149, 178 (2d Cir. 2012); *Amarin Pharma, Inc. v. FDA*, 119 F. Supp. 3d 196, 234 (S.D.N.Y. 2015).

### C. Bayer's Unclean Hands Bar Relief

All relief under the Lanham Act is "subject to the principles of equity." 15 U.S.C. § 1117(a). Among them is "unclean hands," which bars Lanham Act suits where "the plaintiff has engaged in the same kind of behavior that it challenges." *Stokely-Van Camp, Inc. v. Coca-Cola Co.*, 646 F. Supp. 2d 510, 533-34 (S.D.N.Y. 2009).

Bayer's hands are unclean for two reasons. First, Bayer has repeatedly employed the same methods in its own studies that it labels "false" here. These include publishing real-world studies with large imbalances in the treatment cohorts; controlling for comorbidities using Quan-CCI; using the same datasets it attacks here; and drawing inferences of causation from real-world studies, which it says here is impossible. Malone ¶44; Morrow ¶¶101, 104; Morris ¶¶85, 96-98.

Second, Bayer has falsely advertised NUBEQA in numerous ways. It has willfully misled the scientific community about NUBEQA's pivotal FDA clinical trial. *Cf.* Brad Hoffman Declaration ("Hoffman") ¶¶9-12; Drake ¶¶56-59; Gibbons ¶¶60-63. And it has made false claims minimizing NUBEQA's safety risks and exaggerating ERLEADA's. Hoffman ¶¶13-16; Drake ¶¶46-55. This makes Bayer's hands unclean and provides a complete defense to its claims.

## III. BAYER HAS FAILED TO ESTABLISH IRREPARABLE HARM

A plaintiff seeking a preliminary injunction must show that, absent that relief, he will suffer irreparable injury. *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007).

That requires "injury that is neither remote nor speculative, but actual and imminent[,] and that cannot be remedied by....damages.'" *St. Joseph's Hosp. Health Ctr. v. Am. Anesthesiology of Syracuse*, 131 F.4th 102, 106 (2d Cir. 2025). This must be proven, not merely presumed. *See eBay*, 547 U.S. 388; *Fresh Del Monte Produce Inc. v. Del Monte Foods Co.*, 933 F. Supp. 2d 655, 660 (S.D.N.Y. 2013) (noting that *eBay* "applies" to "an injunction against false advertising").[11]

Bayer cites no evidence of *any* harm—let alone *irreparable* harm. These products are not like breakfast cereals purchased anonymously in grocery stores. The parties have sophisticated tools that provide up-to-the-minute data on prescribing behavior, often at the individual-physician level. Lia Zepeda Declaration ¶¶6-10. Yet Bayer identifies no lost prescribers, sales, or market share. It proffers no evidence (even anecdotal) of confusion. Contemporaneous media coverage of the Study and Press Release show that readers *were not* confused. Knobler ¶¶13-17. And Bayer cites zero proof that sophisticated cancer physicians would change their prescribing habits based on a press release and a handful of summary slides, before the full underlying Study has even been published. As JBI's witnesses make clear, they would not. Malone ¶19; Morris ¶¶56-58, 69-72.

## IV.  NEITHER THE BALANCE OF EQUITIES NOR THE PUBLIC INTEREST FAVORS INJUNCTIVE RELIEF

The Court must also consider whether "the balance of equities tips in [Bayer's] favor," and whether "an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). These factors, standing alone, can support denial of relief. *Id.* at 32.

---

[11] In 2020, Congress passed the Trademark Modernization Act, intended to restore a presumption of irreparable harm in trademark cases. *See Nichino Am., Inc. v. Valent U.S.A. LLC*, 44 F.4th 180, 185-87 (3d Cir. 2022). It is not clear whether this extends to *non*-trademark Lanham Act cases. Regardless, the nonmoving party can rebut that presumption with even a "slight evidentiary showing" that irreparable harm is unlikely. *Id.* (finding presumption rebutted by "evidence of a sophisticated consumer class").

The balance of equities does not support Bayer. Again, Bayer has committed the same practices it assails and has falsely advertised NUBEQA. That inequitable conduct makes Bayer ineligible for extraordinary equitable relief.

Meanwhile, a preliminary injunction would irreparably harm JBI's First Amendment rights. "[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 71 (2d Cir. 1996) (cleaned up). Courts are especially reluctant to preliminarily enjoin speech, because they fear "communication will be suppressed...before an adequate determination that it is unprotected by the First Amendment." *Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*, 413 U.S. 376, 390 (1973); *see also Metro. Opera Ass'n, Inc. v. Local 100, Hotel Emps. & Rest. Emps. Intern. Union*, 239 F.3d 172, 178 (2d Cir. 2001).

Finally, patients have a strong interest in the free flow of scientific information—especially about life-threatening diseases. Bayer claims the public's interest is served by having this Court make a rushed judgment, on a limited record, of which side's science is correct. But "courts are ill-equipped" to "referee" such controversies—especially on an emergency basis. *ONY*, 720 F.3d at 497. Moreover, the relevant readership, cancer physicians, is ultra-sophisticated. They routinely assess strengths and weaknesses of studies and decide for themselves how much credence to give them. Drake ¶¶28-30. And Bayer is already blanketing the country with rebuttals to JBI's Study. Knobler ¶¶10-12, 12 n.1. The public interest is not served by a Court-imposed gag order permitting Bayer to disseminate its message unopposed. Rather, it is served by permitting both sides to make their case and letting "the scientific public sit[] as the jury." *ONY*, 720 F.3d at 497.

## CONCLUSION

For the reasons above, Bayer's Motion for Preliminary Injunction should be denied.[12]

Dated: March 6, 2026

By: /s/ *Jonah M. Knobler*
Steven A. Zalesin
Jonah M. Knobler
Amy N. Vegari
Clinton W. Morrison
Emma Ellman-Golan
Margaret M. O'Neil
Andrew Lief
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036-6710
Telephone: (212) 336-2000
Facsimile: (212) 336-2222
sazalesin@pbwt.com
jknobler@pbwt.com
avegari@pbwt.com
cmorrison@pbwt.com
eellmangolan@pbwt.com
moneil@pbwt.com
alief@pbwt.com

*Attorneys for Defendants Johnson & Johnson, Inc.
and Janssen Biotech, Inc.*

---

[12] If, however, the Court does award any relief, it should order separate briefing on (1) the appropriate tailoring of any injunction, and (2) the appropriate size of the required Rule 65(c) bond.

## CERTIFICATION PURSUANT TO S.D.N.Y. LOCAL RULE 7.1(C)

I hereby certify that pursuant to Local Civil Rule 7.1(c) of the Southern District of New York and the Court's March 5, 2026 Order (ECF 38), this memorandum of law contains 10,178 words as calculated by Microsoft Word's word count function, exclusive of this certification, the caption, the table of contents, the table of authorities, and the signature block.

/s/ *Jonah M. Knobler*
Jonah M. Knobler