# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
BAYER HEALTHCARE LLC,                          :
                                               :
                          Plaintiff,           :    No. 26 Civ. 26-CV-1479 (DEH)
                                               :
            v.                                 :
                                               :
JOHNSON & JOHNSON and JANSSEN                   :
BIOTECH, INC.,                                 :
                                               :
                          Defendants.          :
                                               :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

Lynn K. Neuner
Laura Brett
Nicholas Cunha
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017
(212) 455-2000

Simona G. Strauss
SIMPSON THACHER & BARTLETT LLP
2475 Hanover Street
Palo Alto, California 94304
(650) 251-5000

*Attorneys for Plaintiff Bayer HealthCare LLC*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ......................................................................................... 1

ARGUMENT .................................................................................................................... 3

I.    A PRELIMINARY INJUNCTION IS WARRANTED ......................................... 3

    A.    Bayer Is Highly Likely To Prevail On Its Claims ................................... 3

        1.    J&J's Claims Are Commercial Speech ......................................... 3

        2.    The Death Risk Claim Is Literally False .................................... 6

        3.    The Robustness Claim Is Literally False .................................... 8

        4.    J&J Acted in Bad Faith ................................................................ 9

    B.    Bayer Continues To Suffer Irreparable Harm ......................................... 9

    C.    The Public Interest Favors Injunctive Relief ....................................... 11

    D.    The Balance Of Equities Weighs Heavily In Favor Of Bayer ............. 12

II.   JURISDICTION AND VENUE ARE PROPER ............................................... 13

    A.    This Court Has Personal Jurisdiction Over Defendants Under New York's Long-Arm Statute ................................................................................. 13

    B.    Venue Is Proper In This District ........................................................... 17

CONCLUSION ............................................................................................................... 18

# TABLE OF AUTHORITIES

**Cases**

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*,
    171 F.3d 779 (2d Cir. 1999) .................................................................................. 14

*Barrett v. Uber Techs, Inc.*,
    2025 WL 3538599 (S.D.N.Y. Dec. 10, 2025) ......................................................... 17

*Benihana of Tokyo, LLC v. Benihana, Inc.*,
    2017 WL 1424325 (S.D.N.Y. Apr. 19, 2017) ........................................................... 5

*Bracco Diagnostics, Inc.v. Amersham Health, Inc.*,
    627 F. Supp. 2d 384 (D.N.J. 2009) ..................................................................... 5, 6

*Brown v. Web.com Grp.*,
    57 F. Supp. 3d 345 (S.D.N.Y. 2014) ..................................................................... 15

*Carson Optical, Inc. v. RQ Innovasion, Inc.*,
    2020 WL 1516394 (E.D.N.Y. Mar. 30, 2020) ................................................. 13, 16

*D.H. Blair & Co. v. Gottdiener*,
    462 F.3d 95 (2d Cir. 2006) .................................................................................. 15

*Dow Jones & Co., Inc. v. Perplexity AI, Inc.*,
    797 F. Supp. 3d 305 (S.D.N.Y. 2025) ................................................................... 17

*eBay Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006) ........................................................................................... 10

*Excelsior Coll. v. Frye*,
    306 F. Supp. 2d 226 (N.D.N.Y. 2004) .................................................................. 13

*Fresh Del Monte Produce Inc. v. Del Monte Foods Co.*,
    933 F. Supp. 2d 655 (S.D.N.Y. 2013) ................................................................... 10

*G31000 N. Am. v. Paris*,
    2014 WL 6604790 (S.D.N.Y. Nov. 21, 2014) ......................................................... 13

*Glob. Merch. Servs., Ltd. v. Sunfrog, LLC*,
    2018 WL 11223365 (S.D.N.Y. Aug. 9, 2018) ......................................................... 17

*Joint Stock Co. Channel One Russ. Worldwide v. Infomir LLC*,
    2017 WL 825482 (S.D.N.Y. Mar. 2, 2017) ............................................................ 13

*McNeil-P.C.C., Inc. v. Bristol-Myers Squibb Co.*,
    973 F.2d 1019 (2d Cir. 1992) ................................................................................ 7

*Mimedx Grp., Inc. v. Osiris Therapeutics, Inc.*,
    2017 WL 3129799 (S.D.N.Y. July 21, 2017) .......................................................... 5

*ONY, Inc. v. Cornerstone Therapeutics, Inc.*,
  720 F.3d 490 (2d Cir. 2013) ................................................................... 4

*Osmose, Inc. v. Viance, LLC*,
  612 F.3d 1298, 1310 (11th Cir. 2010) ...................................................... 7

*Paciria BioSciences, Inc. v. Am. Soc'y of Anesthesiologists, Inc.*,
  63 F.4th 240 (3d Cir. 2023) ................................................................. 4-5

*Park W. Galleries, Inc. v. Franks*,
  2012 WL 2367040 (S.D.N.Y. June 20, 2012) ......................................... 14

*ParTech, Inc. v. Jackson*, 2025 WL 343215,
  2025 WL 343215 (S.D.N.Y. Jan. 29, 2025) ............................................ 14

*Skillz Platform Inc. v. Papaya Gaming, Ltd.*,
  2025 WL 3268799 (S.D.N.Y. Nov. 21, 2025) ......................................... 10

*Sony Music Ent. v. Slacker, Inc.*,
  2026 WL 446231 (S.D.N.Y. Feb. 17, 2026) ........................................... 15

*Time Warner Cable, Inc. v. DIRECTV, Inc.*,
  497 F.3d 144, 148 (2d Cir. 2007) .......................................................... 10

*Travel Leaders Grp. LLC v. Corley*,
  2019 WL 6647319 (S.D.N.Y. Dec. 5, 2019) ........................................... 13

**Statutes**

15 U.S.C. § 1116(a) ...................................................................................... 10

28 U.S.C. 1391(b)(1) .................................................................................... 17

28 U.S.C. 1391(c)(2) .................................................................................... 17

C.P.L.R. § 302(a)(1) ............................................................................... 13, 15

C.P.L.R. § 302(a)(2) ............................................................................... 13, 15

C.P.L.R. § 302(a)(3) ............................................................................... 13, 14

Plaintiff Bayer respectfully submits this Reply Memorandum of Law in further support of its Motion for a Preliminary Injunction.

## PRELIMINARY STATEMENT

Defendants are intentionally and recklessly making false claims about ERLEADA®'s superiority over NUBEQA® with respect to the reduction in the risk of death as a result of the treatment and about the study that purportedly supports that superiority. Defendants' core argument to avoid a preliminary injunction boils down to this: they should be able to say whatever they want under the guise of scientific discourse, and physicians will understand what Defendants really mean and what they don't really mean despite what the advertising actually says. According to Defendants, physicians should ignore the sensationalist "51% reduction in risk of death through 24 months with apalutamide compared with darolutamide" headline, ignore that this answer responded to the question "How well did apalutamide work?," and ignore that the Data Analysis doesn't actually support the conclusion. "First Amendment!," "Freedom!" clamor Defendants in their opposition papers. Their protests cannot be reconciled with the Lanham Act, which fundamentally prohibits false advertising.

Defendants know their Press Release is commercial speech and makes false claims to everyone, including metastatic prostate cancer patients desperate to survive. The Press Release unambiguously claims that the risk of death can be cut in half from treatment with ERLEADA® rather than NUBEQA®. Defendants protest that they did not make any causation claims, ignoring that the Press Release refers to the "survival *benefit of apalutamide* versus darolutamide." The Press Release also unambiguously – and falsely – claims that patients received "24-months of follow up," which Defendants dismiss as "medical parlance." With their advertising, Defendants have started to achieve their goals: the media and generative AI machines have picked up what Defendants have put down – a clear causation between taking

1

ERLEADA® rather than NUBEQA® and the reduction in the risk of death. Defendants' opposition papers suggest that none of this matters because the "relevant readers" are the physicians rather than the patients or their loved ones. However, J&J utilized PR Newswire, a commercial wire distribution service, to bolster the reach of its claims to health consumers and others far beyond physicians. False information on critical treatment choices harms patients and their doctors. Patients who think they will live longer if they take one drug instead of another will ask for that drug.

Defendants argue they do not violate the Lanham Act because they are just faithfully reporting on the findings of a study. It would be an absurd outcome under the Lanham Act to allow a pharmaceutical manufacturer to design and sponsor a study, have several of its employees author the study, and then falsely represent the study's findings with impunity, especially when the study was purposely designed to favor the manufacturer.

Defendants' opposition papers fail to overcome the Data Analysis's limitations that render it inherently unreliable and thus not supportive of the Death Risk Claim:

- Comparison of essentially non-comparable cohorts taking drugs on-label and off-label, resulting in fundamental selection bias that cannot be controlled

- Failure to account for known non-cancer comorbidities

- Skewing of results due to dramatic imbalance in sample sizes

- Flawed data sources that were not verified or corrected

- Truncated treatment periods contradicting the Press Release claim that patient experience was "through 24-months of follow-up"

J&J's false advertising harms Bayer as the direct competitor whose product is called out as being markedly inferior on a death metric. Importantly, it also hurts doctors and

patients who are fed false information about the comparative reduction in death risk benefits of ERLEADA® and NUBEQA®.

This Court has the power to enter the preliminary injunction needed to stop Defendants from disseminating false claims.  Defendants are subject to personal jurisdiction in New York both because they are training New York doctors who serve as J&J Speakers on the Data Analysis and because their false advertising is harming Bayer in New York, which Defendants acknowledge to have "the world's largest concentration of top-tier academic and medical institutions," and which has the nation's highest urologist-to-population ratio. Defendants' promotions are directed to these urologists and to prostate cancer patients.  It was reasonable for Defendants to expect their advertising claims to have consequences in New York, both for Bayer and for New Yorkers.

A preliminary injunction should be issued to stop J&J's pernicious promotional campaign.

## <u>ARGUMENT</u>

## I.    A PRELIMINARY INJUNCTION IS WARRANTED

### A.    Bayer Is Highly Likely To Prevail On Its Claims

#### 1.    J&J's Claims Are Commercial Speech

J&J argues that its promotional campaign is protected by the First Amendment because it is scientific discourse.  Opp. at 14-16.  False advertising is not protected.

J&J has not published the Data Analysis in a peer-reviewed journal.  Nor has J&J limited its Data Analysis to the scientific community, opting instead to issue a public-facing Press Release, at the same time that it published on its website, and presented at a conference, four substantive slides and one Overview Slide, each of which make the Death Risk Claim and the Robustness Claim.  J&J's assertion that a one-page, 500-word abstract was subject to peer

review before the Data Analysis was presented at the IPCU, *id.* at 7-8, is nonsense.  Andres Decl.

¶¶2-3.  Peer review requires an independent process for experts in the field to validate research

methods and scrutinize the analysis *before publication* in order to uphold strong scientific

standards.  While hiding behind the cloak of "scientific discourse," J&J flipped the order of the

process by first releasing the findings of its Data Analysis to the public, bypassing the process by

which scientists review and reach conclusions as to the soundness of the study before its

publication.  And J&J still has not published the study in a manner that would allow for the

scientific discourse contemplated in the cases it cites.

 Unlike the defendants in *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d

490 (2d Cir. 2013), J&J has not published its Data Analysis in any journal, much less "the

leading journal in the field."  *Id.* at 494.  The *ONY* court noted that peer-reviewed academic

journals "warrant that research approved for publication demonstrates at least some degree of

basic scientific competence . . . in which the trial of ideas plays out in the pages of peer-reviewed

journals, and the scientific public sits as the jury."  *Id.* at 497.  The court reasoned that when

articles are "presented in publications directed to the relevant scientific community," scientists

are able to respond by analyzing "the soundness of the experimental design or the validity of the

inferences drawn from the results."  *Id.* at 496-97.  Here, J&J chose to issue a press release to the

public.  As a result, rather than the scientific community debating the validity of the study, online

search platforms repeat J&J's bold claims, and the debate plays out in public with an audience of

lay people who were not told about the Data Analysis's fatal limitations.

 J&J relies on *Paciria BioSciences, Inc. v. Am. Soc'y of Anesthesiologists, Inc.*, 63

F.4th 240 (3d Cir. 2023), in which the Third Circuit considered a trade libel claim brought in

connection with articles published in *Anesthesiology*.  The court dismissed the claim, reasoning

that readers of this "leading journal in the field" of anesthesiology "were provided with the data and methodology on which the [challenged] statements were based." *Id*. at 249. Again, unlike J&J, the defendants in that case submitted their work for publication, which allowed specialists to accept or reject the conclusions based on their independent evaluation of the facts. *Id*. at 248. The scientific analysis and response contemplated by the *ONY* and *Paciria* courts is precisely what J&J has prevented with its Press Release announcing the Data Analysis.[1]

Instead, J&J cherry-picked its findings and packaged them into a promotional campaign designed to influence prescribing decisions. J&J's Press Release, with its sensationalist promotional headline and false bolstering of the Data Analysis, is not part of scientific discourse. It is a promotional communication, disseminated to the news media and picked up by AI search platforms, claiming a benefit of taking ERLEADA® over NUBEQA®. *See Mimedx Grp., Inc. v. Osiris Therapeutics, Inc.*, 2017 WL 3129799, at *8 (S.D.N.Y. July 21, 2017) (holding that press release was commercial speech); *Benihana of Tokyo, LLC v. Benihana, Inc.,* 2017 WL 1424325, at *5 (S.D.N.Y. Apr. 19, 2017) (same).

The Presentation and Overview Slides are not protected studies published in peer-reviewed academic journals. They are promotional summaries created by J&J to deliver a specific commercial message, and they are actionable for that reason. J&J's own cited *Bracco Diagnostics, Inc.v. Amersham Health, Inc.* drew precisely this distinction, holding that while a scientific article published in the New England Journal of Medicine was protected non-commercial speech, the company's dissemination of that article's findings through press

---

[1] The *Paciria* court noted "[t]here are, of course, circumstances in which courts may need to assess the reliability of a scientific study," and pointed to the Lanham Act, because literal falsity may be established based on the lack of reliability of the studies upon which the challenged claims are made. 63 F.4th at 248 n.17. That is our situation here.

releases, websites, CME presentations, and sales materials constituted commercial speech.  627 F. Supp. 2d 384, 458 (D.N.J. 2009).  While J&J claims its materials are "restricted to medical professionals," the slides are publicly available, and nothing prevents prostate cancer patients or their loved ones from accessing the information with the hope of finding the best chance of survival.  Dinello Decl. ¶18.  Indeed, J&J's website is available to anyone who self-identifies as a "U.S. payer," which to a layperson can mean anyone who lives in the U.S. and pays insurance deductibles.

### 2.    The Death Risk Claim Is Literally False

J&J has not refuted the falsity of its core Death Risk Claim: that mCSPC patients treated with ERLEADA® have a 51% reduction in risk of death relative to those treated with darolutamide.  Mem. at 17-18.  J&J's argument that it did not claim causation is unavailing.  Repeating the 51% reduction in death risk figure in response to the question "How well did apalutamide work?" is a representation of causation.  And it is nonsensical to suggest that the Press Release's reference to the "survival benefit of apalutamide versus darolutamide" is anything other than a statement of causation.  That is the only way any "linguistically competent person" would understand that representation.  Opp. at 17.  The same holds true for the statement that the Data Analysis demonstrates that mCSPC patients experienced a 51% "reduction in the risk of death" compared to those who took NUBEQA®.  The Data Analysis, however, does not support this causation as it is a real-world evidence review that is observational in nature.  Constantinovici Decl. ¶43.

Further, J&J concedes that a claim is literally false for purposes of the Lanham Act if the study that purportedly supports the claim is not sufficiently reliable.  J&J argues only that its claims are not establishment claims because they "merely describe the data or findings of [the Data Analysis]."  Opp. at 19.  This is flatly wrong.  J&J's entire claim is based on the results

of the Data Analysis – it is a textbook example of an "establishment claim." In the Press Release, for example, J&J announced that the Data Analysis "demonstrates" and "shows" that mCSPC patients experienced a 51% reduction in the risk of death compared to those who took NUBEQA®. It is well-established in the Lanham Act case law that establishment claims can turn on the words "demonstrate" and "show" in addition to "prove."[2]

As Bayer demonstrated in its opening papers, the Death Risk Claim is false. Comparing treatments when the treatment regimen for NUBEQA conflicts with its FDA approved use is a fundamental flaw that makes the Data Analysis unreliable, and any communication of its results false. Mem. at 19-20; Dean Decl. ¶18. Due to J&J's failure to meet FDA standards, combined with many other methodological flaws in the Data Analysis, including comparison of non-comparable cohorts, unbalanced cohort sizes, reliance on low-quality datasets, and failure to follow up for 24 months as claimed, it has not shown superior efficacy. J&J's witnesses opine that the Data Analysis is not flawed, just limited, and that no doctors will put weight on the analysis until the full results are published. It is striking that J&J contends that no one should believe J&J's headline claim because of course it cannot show causation, and of course its study has all sorts of weaknesses, and of course it did not account for unmeasured non-cancer comorbidities, and so on. This all underlines that J&J never should have issued the Press Release announcing that patients have a 51% lower risk of death if they take ERLEADA® instead of NUBEQA®. The Data Analysis cannot support it.

---

[2] *McNeil-P.C.C., Inc. v. Bristol-Myers Squibb Co.*, 938 F.2d 1544, 1546 (2d Cir. 1991); *Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1310 (11th Cir. 2010).

### 3.    The Robustness Claim Is Literally False

To sell the conclusions of its outcome-driven Data Analysis, J&J makes the false Robustness Claim touting the Data Analysis's "rigorous methodology."  Mem. at 18-25.  J&J spends much ink trying to justify its methodological missteps but fails at each junction.  We highlight certain issues here and address others in the declarations.

Responding to the non-comparable cohort problem, J&J argues that the predominance of off-label prescribing of NUBEQA® during the study period does not affect the validity of its results because off-label prescribing is routine in prostate cancer treatment.  Opp. at 25.  That argument misses the point.  The issue is not whether off-label prescribing is common, but whether the two treatment cohorts in J&J's analysis were subject to fundamentally different prescribing conditions.  They were, specifically because during 97% of the study period, physicians prescribing NUBEQA® were doing so off-label, while physicians prescribing ERLEADA® were not.  That dichotomy invariably leads to inherent selection bias, Mem. at 7-8. 20-21, as physicians prescribing a therapy off-label are necessarily prescribing to patients based on clinical considerations that are not captured in the underlying dataset and therefore cannot be controlled for in the analysis.  Constantinovici Decl. ¶3; Sullivan Decl. ¶¶9-10.

J&J's attempt to address this problem through inverse probability of treatment weighting ("IPTW") does not resolve the issue.  IPTW assigns greater statistical weight to patients who appear most similar across treatment groups based on the variables available in the dataset.  Thus, if patients are similar in terms of captured underlying comorbidities but differ greatly due to uncaptured non-cancer related comorbidities, the resulting "balancing" is illusory. Assigning equal statistical weight to patients with materially different clinical conditions does not correct underlying population differences; it obscures them.  Andres Decl. ¶10; Sullivan Decl. ¶¶9-16.

8

J&J contends that the size disparity between the two cohorts does not undermine the validity of the analysis.  Opp. at 27.  But Bayer did not suggest that unequal cohort sizes are inherently improper.  Rather, the problem arises when unequal cohort sizes are used in an analysis where the underlying populations are already non-comparable.  In that circumstance, a smaller cohort will more sharply reflect any underlying imbalance in patient characteristics. When a dataset contains a relatively small number of patients, individual outliers—such as patients with unusually severe comorbidities or atypical clinical trajectories—can exert a disproportionately large influence on the overall results.  In J&J's Data Analysis, the NUBEQA® cohort (n=287) is over five times smaller than the ERLEADA® cohort (n=1,460), and there is a 14% mortality proportion for the NUBEQA® cohort.  It requires only a small number of deaths due to unmeasured variables to have a noticeable influence on the hazard ratio of 0.49 (*i.e.,* the 51% reduction in risk of death).  Ennis Decl. ¶¶6-8.

### 4.    J&J Acted in Bad Faith

Bayer has shown J&J's bad faith in promulgating its false advertising claims. Mem. at 25-26.  The bad faith is confirmed by J&J's refusal to stop making the claims and, worse, to double down on those claims by repeating them to urologists through sales reps and paid speakers at in-person meetings.  Dinello Decl. ¶¶5-9.  Unsurprisingly, J&J does not address the bad faith point beyond agreeing it is an element.  Opp. at 17 n.3.

### B.    Bayer Continues To Suffer Irreparable Harm

The question of irreparable harm to J&J is easily met given the controlling statutory standard for the presumption of irreparable harm for violations of the Lanham Act:

> A plaintiff seeking any such injunction shall be entitled to a rebuttable presumption of irreparable harm . . . upon a finding of likelihood of success on the merits for a violation identified in this subsection [including a violation of 15 U.S.C. § 1125] in the case of a motion for a preliminary injunction . . . .

9

15 U.S.C. § 1116(a); *see Skillz Platform Inc. v. Papaya Gaming, Ltd.*, 2025 WL 3268799, at *6

(S.D.N.Y. Nov. 21, 2025).  *eBay Inc. v. MercExchange, L.L.C.*, and *Fresh Del Monte Produce

Inc. v. Del Monte Foods Co.*, cited by Defendants, both predated the 2020 amendment to Section

1116(a) and thus do not account for the current statutory framework.[3]  Further, even before the

amendment, irreparable harm was presumed in this Circuit when a defendant makes comparative

false advertising claims about a direct competitor's product.  Mem. at 26-28; *Time Warner

Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 148 (2d Cir. 2007).

   The irreparable harm to Bayer is clear.  Bayer and J&J are head-to-head

competitors in the highly competitive market for ARIs.  J&J's Death Risk Claim explicitly

compares J&J's ERLEADA® to darolutamide.  J&J cannot refute that Bayer will suffer

irreparable harm from lost sales of NUBEQA®, reputational damage, and loss of goodwill

unless J&J's false advertising is preliminarily enjoined.  Further, the harm to Bayer is increasing

as online search query results continue to tout the Data Analysis as support for the conclusion

that, for example, "Erleada reduces the risk of death by ~51% compared in Nubeqa in mCSPC

patients not receiving docetaxel."  Dinello Decl. Ex. K; Brett Decl. Exs. A and B.  This is exactly

the message J&J sought to convey through its advertising campaign despite the fact that it is

false.

   Oddly, J&J claims that there is no harm from its promotional campaign because

no prescribing doctor will believe the results of the Data Analysis.  J&J submits declarations

from two urologists who say that J&J's initial presentations have limitations and weaknesses and

they would need to see the full results before they could consider the outcomes valid.  This

---

[3] Defendants speculate that "it is not clear whether [the statutory amendment] extends to non-
trademark Lanham Act cases."  Opp. at 32 n.11.  The statute contains no such restriction.

testimony actually *indicts* J&J for blasting out the study results in a press release to the whole world.  Tellingly, J&J's own Speaker/Urologist states:  "Indeed, this complex scientific information is not the type that is usually directed to patients."  Morris Decl. ¶78.  J&J says no harm, no foul because patients can get access to prescription medicines only through their doctors, and doctors will not credit patients' views.  But J&J advertised this Data Analysis to the lay public for a reason.  Bayer's research shows that in approximately 80% of the cases where a patient asks a doctor for a particular medicine, the patient will receive that medicine.  Indeed, pharmaceutical companies spent more than $10 billion on direct-to-consumer advertising for prescription medicines in 2025.  Dinello Decl. ¶¶15-16.

### C.    The Public Interest Favors Injunctive Relief

J&J cannot dispute that the public interest is in *truthful* advertising.  Enjoining J&J's false claims will serve that public interest.  Mem. at 28.  An injunction will prevent further harm to public health as a result of prescription decisions made in response to J&J's false claims.

J&J's sole response is that "patients have a strong interest in the free flow of scientific information – especially about life-threatening diseases" and that the "relevant readership, cancer physicians, is ultra-sophisticated."  Opp. at 33.  J&J has it wrong:  patients have an interest in receiving *accurate* information, not false claims of superiority in reducing the risk of death.  Further, J&J ignores that the "relevant readership" includes patients, who do not have decades of clinical and research experience to know that J&J's proclaimed head-to-head superiority claim is unsubstantiated.  J&J's assertion that doctors will be skeptical about the promoted claims because the Data Analysis is preliminary and limited in value ignores that the medical community has different levels of sophistication in understanding RWE and does a disservice to doctors across the globe, who should not be polluted with false claims of clinical superiority based on an unreliable study.  Constantinovici Decl. ¶¶3, 22, 31.

11

### D.      The Balance Of Equities Weighs Heavily In Favor Of Bayer

The balance of equities and hardships favors injunctive relief here, as J&J's interest in making false claims does not outweigh the resulting harm to Bayer and to prostate cancer patients and their providers from being exposed to erroneous information.  Mem. at 29. Unable to cite any legitimate harm it would suffer from being limited to truthful claims, J&J attempts to focus on Bayer's supposedly unclean hands.  Opp. at 31, 33.  That attempt fails.

Bayer's Reply declarations deal with these issues; we highlight a few points here. J&J incorrectly asserts that Bayer used the same study designs challenged here.  Bayer published the studies J&J references in peer-reviewed journals and did not present them as proof that one therapy caused superior outcomes.  Instead, those studies were framed as observational analyses evaluating whether therapies performed similarly in real-world settings, consistent with the well-recognized limitations of retrospective research.  One study explicitly noted that "a causal link cannot be established."  Bayer's methodology also included controls that J&J did not, such as cross-referencing PPS data with more reliable patient chart-level data maintained by healthcare providers and filtering out the patients who did not meet the eligibility criteria upon closer inspection.  Constantinovici Decl. ¶21.

J&J asserts that Bayer makes improper claims on the NUBEQA® website based on preclinical models.  Opp. at 31.  But the specific preclinical information J&J references is accompanied by clear disclosure that "[t]he penetration of NUBEQA® across the human blood-brain barrier has not been studied; therefore, no such assumptions can be made."  Andres Decl. ¶22.

As another example, J&J's declarants take issue with Bayer's characterization of interim overall survival data in its ARANOTE trial as "immature."  That language was appropriate because the trial had not yet reached its final OS analysis.  When the study was

completed with the final data, Bayer updated its prescribing information and its promotional

material to state plainly that the ARANOTE study showed no statistically significant

improvement in OS.  That reporting evolution from interim data to final results was accurate and

transparent.  Andres Decl. ¶18.

## II.    JURISDICTION AND VENUE ARE PROPER

### A.    This Court Has Personal Jurisdiction Over Defendants Under New York's Long-Arm Statute

Defendants argue that they are not subject to personal jurisdiction in New York

based on C.P.L.R. § 302(a)(1).  Opp. at 11-12.  Defendants relegate to a mere footnote reference

to C.P.L.R. § 302(a)(2) and (3), arguing that these bases for jurisdiction do not apply because

Bayer's claims sound in defamation, which is exempted.  *Id*. n.2.  However, courts regularly

exercise jurisdiction under Section 302(a)(2) and 302(a)(3) in cases involving Lanham Act and

unfair competition cases.  *See, e.g.*, *Carson Optical, Inc. v. RQ Innovasion, Inc.*, 2020 WL

1516394, at \*5–6 (E.D.N.Y. Mar. 30, 2020); *Travel Leaders Grp. LLC v. Corley*, 2019 WL

6647319, at \*5 (S.D.N.Y. Dec. 5, 2019); *Joint Stock Co. Channel One Russ. Worldwide v.

Infomir LLC*, 2017 WL 825482, at \*13–15 (S.D.N.Y. Mar. 2, 2017); *Excelsior Coll. v. Frye*, 306

F. Supp. 2d 226, 229 (N.D.N.Y. 2004).[4]

Defendants are subject to jurisdiction under Section 302(a)(2) because they

"commit[ed] a tortious act within the state."  J&J held a live Speaker training session on the Data

Analysis with New York doctors to serve as J&J Speakers.  The purpose of training Speakers on

new developments, like the Data Analysis, is so that that they can then serve as Speakers at

meetings with other doctors in their areas about the new developments.  J&J has therefore

---

[4] Defendants cite *G31000 N. Am. v. Paris*,  but plaintiffs there only "nominally alleged torts
other than defamation."  2014 WL 6604790, at \*2 (S.D.N.Y. Nov. 21, 2014).

directly communicated its false claims to leading New York doctors and is training them to speak to other physicians about the flawed Data Analysis.  Dinello Decl. ¶¶5-7.

Defendants are also subject to jurisdiction under Section 302(a)(3), which applies when a defendant commits a tortious act outside New York causing injury to a person within the state where the defendant either (i) "derives substantial revenue from goods . . . consumed . . . in the state," or (ii) "should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce."  C.P.L.R. § 302(a)(3)(i–ii).  Both subsections are satisfied.

**Bayer will suffer injury in New York as a result of J&J's false claims.**  For commercial torts like unfair competition, the situs of injury is "the place where the plaintiff lost business."  *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 793 (2d Cir. 1999).  For purposes of Section 302(a)(3), a non-forum plaintiff can rely on anticipated lost sales in New York.  *Park W. Galleries, Inc. v. Franks*, 2012 WL 2367040, at *4 (S.D.N.Y. June 20, 2012).  "The reasonable anticipation of a threatened injury in New York" is sufficient; Bayer "need not wait until its business prospects are potentially destroyed beyond recovery before it may invoke New York's long-arm statute."  *ParTech, Inc. v. Jackson*, 2025 WL 343215, at *6 (S.D.N.Y. Jan. 29, 2025).  Here, it is reasonable to expect Defendants' false advertising to cause Bayer to lose sales of NUBEQA® to New York customers.  Dinello Decl. ¶10.

**Defendants derive substantial revenue from interstate commerce and from goods consumed in New York.**  Defendants derive *billions* in revenue annually in the U.S., and ERLEADA® itself generated $1.45 billion in U.S. sales in 2024.  Dinello Aff. ¶10; Dinello Decl. ¶4.  Defendants derived substantial revenue from sales of ERLEADA® consumed in New York alone given New York's concentrated cluster of prostate cancer treatment centers.  While

discovery will reveal the exact amounts, it is reasonably probable that Defendants earn hundreds

of millions of dollars in revenue based on sales to this state, much of which stems from New

Yorkers' consumption of ERLEADA®.  Jurisdiction is therefore appropriate.  *See Brown v.*

*Web.com Grp.*, 57 F. Supp. 3d 345, 358 (S.D.N.Y. 2014) (finding jurisdiction where defendant

"raise[d] a great deal of its gross revenue from New York customers" and acknowledging that

jurisdiction can be based on 1–5% of sales in New York).

> ***Defendants should reasonably expect their false advertising to have***
> ***consequences in New York.***  It is objectively reasonable for J&J to expect that claims about

prostate cancer treatment will have consequences in New York, a prime target market for

Defendants' marketing efforts, particularly for specialty prescription drugs like ERLEADA®.

Indeed, our state has the highest concentration of urologists in the nation at 5.74 per 100,000

population.  New York is home to two of the world's top oncology centers: Memorial Sloan

Kettering Cancer Center, which conducted research leading to ERLEADA®'s regulatory

approval and features the product on its website, and NYU Langone Health, whose Smilow

Comprehensive Prostate Cancer Center offers specialized, multidisciplinary prostate care and has

conducted studies on ERLEADA®.  There are multiple specialized treatment centers in Long

Island, and of course, urologists treat prostate cancer patients throughout the State.  Dinello Decl.

¶¶10-13.[5]

Defendants are also subject to jurisdiction under Section 302(a)(1).  J&J

maintains a physical presence in New York through a facility built by Johnson & Johnson

---

[5] Courts routinely hold that "the constitutional requirements of personal jurisdiction are satisfied
because application of N.Y. C.P.L.R. § 302(a) meets due process requirements."  *D.H. Blair &
Co. v. Gottdiener*, 462 F.3d 95, 105 (2d Cir. 2006); *Sony Music Ent. v. Slacker, Inc.*, 2026 WL
446231, at *4 (S.D.N.Y. Feb. 17, 2026).

Innovation LLC in collaboration with the New York Genome Center, which received $17 million in New York State funding; J&J advertises job openings in over 10 New York locations; and J&J has more than 10,000 employees who state they live in New York City.  Dinello Decl. ¶¶17-18.[6] In addition, Bayer's claims arise directly from Defendants' New York business transactions because the advertising concerning ERLEADA® has been disseminated to New York prescribers and consumers as part of Defendants' efforts to sell ERLEADA® in New York, causing competitive harm to Bayer in the form of lost sales of NUBEQA® to New York customers. "Courts in the Second Circuit have found that false advertising . . . claims—where products are sold to New York consumers, competitively harming a plaintiff—satisfy the substantial nexus requirement."  *Carson Optical, Inc. v. RQ Innovasion Inc.*, 2020 WL 1516394, at *4 (E.D.N.Y. Mar. 30, 2020).

J&J's assertion that Bayer's claims "have no connection to New York," Opp. at 12, ignores J&J's interactions *in New York* and the injury Bayer will suffer *in New York*.  J&J has refused to cease making its false claims and instead maintained that it intends to use the Data Analysis in promotional activities, including in Speaker Series and in visits by sales representatives to doctors.  J&J has already held a training session on the Data Analysis for New York doctors who serve as J&J Speakers.  And J&J has been hosting Speaker Series events in other states regarding the Data Analysis, inviting doctors to hear about "Head-to-Head Overall Survival Data in mCSPC: A Review of Real-World Evidence."  In addition, Bayer has heard

---

[6] J&J is hardly a stranger to New York.  Indeed, J&J agreed to litigate other disputes with Bayer in New York, as demonstrated by the *Bayer AG v. Janssen Pharmaceuticals, Inc.* case pending before this Court.  And J&J has no issue filing lawsuits in New York courts when it wants to litigate here.  *E.g.*, *Johnson & Johnson v. Powerful Swing LLC*, No. 22-cv-05746 (S.D.N.Y. July 6, 2022); *Johnson & Johnson v. Beauty Solutions, Ltd.*, No. 08-cv-4440 (S.D.N.Y. May 12, 2008).

from urologists that J&J representatives are raising the Data Analysis in sales calls in other states.  Dinello Decl. ¶9.  New York has over 1,100 urologists.  Direct outreach to New York's urologists will have an outsized impact on the urology field.  It is sleight-of-hand for J&J to suggest that it has not been and will not be talking to urologists in New York about the Data Analysis and thereby promoting sales of ERLEADA® when that promotional activity is exactly what J&J has stated it wants to do and has already started to do with its Speakers.

### B.    Venue Is Proper In This District

Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) because Defendants both "reside" here.  Defendants argue in their venue section that they only "reside" where they are incorporated or conduct their principal place of business, Opp. at 13, but they overlook the relevant definition of "residency" in 28 U.S.C. § 1391(c)(2), which provides that for venue purposes, an entity is "deemed to reside" in "any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question."  As Judge Hellerstein explained, "[r]eading these provisions [of § 1391] together, it becomes apparent that the venue inquiry collapses into the personal jurisdiction inquiry for entities that are not natural persons."  *Glob. Merch. Servs., Ltd. v. Sunfrog, LLC*, 2018 WL 11223365, at *4 (S.D.N.Y. Aug. 9, 2018); *see also Dow Jones & Co., Inc. v. Perplexity AI, Inc.*, 797 F. Supp. 3d 305, 333-34 (S.D.N.Y. 2025).[7]  Because Defendants are subject to the Court's personal jurisdiction, venue is proper.

---

[7] J&J's reliance on *Barrett v. Uber Techs, Inc.* is misplaced because the defendants there were not subject to personal jurisdiction and therefore did not "reside" in the district under Section 1391(c)(2).  2025 WL 3538599, at *3 (S.D.N.Y. Dec. 10, 2025).

## **CONCLUSION**

For the foregoing reasons, Bayer respectfully requests that its motion for a preliminary injunction be granted.

Dated: New York, New York
        March 9, 2026

Respectfully submitted,

SIMPSON THACHER & BARTLETT LLP

By: */s/ Lynn K. Neuner*
Lynn K. Neuner
Laura Brett
Nicholas Cunha
425 Lexington Avenue
New York, New York 10017-3954
(212) 455-2000

Simona G. Strauss
2475 Hanover Street
Palo Alto, California 94304
(650) 251-5000

*Attorneys for Plaintiff Bayer HealthCare LLC*

## <u>WORD COUNT CERTIFICATION</u>

I, Nicholas Cunha, an attorney authorized to practice in the courts of the State of New York and this Court, hereby certify that pursuant to Local Civil Rule 7.1(c) of the United States District Courts for the Southern and Eastern Districts of New York, the foregoing **REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**, exclusive of this certification, the caption, table of contents, table of authorities, and the signature block consists of 5,290 words.  The word count was performed using Microsoft Word's word count function.

*/s/ Nicholas Cunha*